**UNITED STATES of America, Plaintiff,**

v.

**Stanley P. GIMBEL, Defendant.**

**No. 85–CR–101.**

United States District Court,
E.D. Wisconsin.

Oct. 11, 1985.

G. Roger Markley, Sp. Asst. U.S. Atty., Chicago, Ill., for plaintiff.

William M. Coffey, Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

CURRAN, District Judge.

On July 16, 1985, a federal grand jury returned a six-count Indictment against the defendant Stanley P. Gimbel. The Indictment charges Gimbel with one count of perpetrating a scheme to conceal material facts from the Internal Revenue Service (IRS). *See* 18 U.S.C. §§ 1001 and 2. Counts II through VI charge that Gimbel committed wire and mail fraud in furtherance of his scheme. *See* 18 U.S.C. §§ 1341 and 1343.

After the defendant was arraigned on August 1, 1985, he filed a number of motions challenging the form and substance of the Indictment and requesting discovery. Certain of these motions and the positions the parties have taken on the issues raised are discussed in the Recommendation and Orders issued by the magistrate on September 9 and 11, 1985, which the court incorporates herein by reference. The court's position on these decisions will be discussed following a determination of the motions to dismiss.

## I. MOTIONS TO DISMISS

The magistrate did not make a recommendation on seven defense motions which raise substantive grounds for dismissing counts of the Indictment. A resolution of these motions depends to an extent on an interpretation of the court's Decision and Order dismissing a a previous indictment returned against Gimbel. *See United States v. Gimbel*, 632 F.Supp. 713 (E.D. Wis.1984) (Decision and Order dismissing indictment without prejudice). *See also United States v. Gimbel*, No. 84–CR–10 (E.D.Wis. March 12, 1985) (Decision and Order denying government's motion for reconsideration of Decision and Order dismissing indictment) [hereinafter these two decisions will jointly be referred to as *Gimbel I*].

The defendant moves the court for an order dismissing Count I of the present Indictment on the grounds that:

1. 18 U.S.C. §§ 1001 and 2 are unconstitutional as applied;
2. it fails to allege an offense;
3. it is analytically indistinguishable from Count I of the indictment previously dismissed by the court;
4. it is duplicitous; and
5. it is impermissibly vague in violation of Federal Rules of Criminal Procedure 7(c)(1) and 12(b)(2).

Gimbel also asks the court to dismiss Counts II through VI on the grounds that:

1. 18 U.S.C. §§ 1341 and 1343 are unconstitutional as applied; and
2. they fail to allege an offense.

The parties were afforded an opportunity for additional briefing on certain of these motions. This briefing is now completed and the motions are ready for decision.

In ruling on these motions to dismiss, the court must assume that the facts as alleged in the Indictment are true and it may not consider the defendant's contrary assertions of fact. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952). In general, "[a]n indictment is sufficient if it contains the elements of the offense charged and adequately informs the defendant of the specific charges against him, enabling him to prepare a defense for trial and permitting him to plead an acquittal or conviction in order to bar any future prosecution for the same offense." *United States v. Brack*, 747 F.2d 1142, 1146 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985).

The Indictment now before the court contains six counts. Count I charges that:

From on or about an exact date unknown in 1978 to on or about January 1984 at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

STANLEY P. GIMBEL,

defendant herein, did knowingly, willfully and intentionally conceal and cover-up, and cause to do so, by trick, scheme and device, material facts within the jurisdiction of an agency or department of the United States, that is, the United States Department of the Treasury, Internal Revenue Service.

The material facts which the defendant is said to have concealed include the fact that Gimbel deposited more than $10,000.00 in currency into one bank account during the course of one day and the fact that he withdrew more than $10,000 in currency from the same bank account during the course of one day. As a result of these structured transactions, the bank failed to file Currency Transaction Reports (CTRs) with the IRS. The purpose of this scheme was to "conceal and cause to be concealed from the government the existence, source and transfer of currency well in excess of $100,000.00"—in common parlance, "money laundering." As part of this scheme, Gimbel, a lawyer, is alleged to have misused his law firm's trust account and artificially structured his own transactions in currency. He is also said to have counseled others to disguise their own currency transactions, to use false names when doing business at a financial institution, and to report income to the IRS in an amount different from that actually received. In addition, the Indictment specifies twelve different dates upon which Gimbel artificially structured currency transactions at a bank. The charging paragraph of Count I tracks the relevant language of the statutes allegedly violated. *Compare* Indictment, Count I at ¶ 2 *with* 18 U.S.C. §§ 1001 and 2.

Counts II, III, IV and VI charge Gimbel with using interstate wires and mails in furtherance of his scheme to defraud the IRS. Again, the charging paragraphs of these counts track the language of the statutes allegedly violated. *Compare* Indictment, Count II at ¶ 21; Count III at ¶ 2; Count IV at ¶ 2; and Count VI at ¶ 2 *with* 18 U.S.C. § 1343. *Compare also* Indictment, Count V at ¶ 2 *with* 18 U.S.C. § 1341.

Counts II through VI charge Gimbel with using the mails and wires in connection with his scheme to defraud the United States Department of the Treasury

by impeding, impairing, obstructing, inhibiting, frustrating and defeating the lawful governmental functions of the Department of the Treasury in: (A) the collections of data and reports of currency transactions at financial institutions in excess of $10,000.00 for use in criminal, tax and regulatory investigations and proceedings; and (B) the obtaining of accurate and truthful information and data to be used to determine the correct source and amount of income and in the determination and assessment of the revenue, that is, income taxes.

Indictment, Count II at ¶ 2. As part of the scheme Gimbel is alleged to have assisted, counseled and discussed with others various methods of laundering their own money by, among other things, evading their reporting requirements, improperly calcu-

lating their taxable income, and inaccurately reporting income to the IRS.

 Having just outlined the facts of the Indictment, it bears repeating that a court considering the sufficiency of the charges before trial must regard the facts alleged as true and cannot weigh them against contrary assertions by the defendant. The court is also confined to considering only the facts, acts and allegations contained within the Indictment itself. Only under limited circumstances can the court take notice of any additional material. *See United States v. Russell*, 415 F.Supp. 9, 10–11 (W.D.Tex.1975). These principles are of some concern to this court because the parties, in their creditable efforts to zealously advocate their respective positions, have presented the court with documents, affidavits, extraneous facts and other matters which cannot properly be considered by the court at this stage. Accordingly, the court will disregard this material. Questions of fact are for the trier of fact to decide. Only if a motion to dismiss raises strictly a question of law, can it be properly considered. *United States v. Caceres-Prado*, 601 F.Supp. 468, 470 (D.P.R.1984).

## A. Count I

The defendant first contends that Count I of the Indictment must be dismissed because 18 U.S.C. §§ 1001 and 2 are unconstitutionally vague as applied to the facts alleged. Then he argues that Count I must be dismissed for failure to state an offense. This method of presentation confuses the issues, because on one hand Gimbel is saying that the statutes are so vague that they do not give fair warning of what is prohibited, while on the other hand he is saying that these same statutes are so clear that it is obvious that they do not cover the acts alleged. Only if these statutes do cover the acts alleged could they give a person fair warning that such acts are prohibited. Thus, these issues will be discussed together.

The charge in Count I depends upon an interweaving of several criminal statutes.

Section 1001 forbids concealing material facts within the jurisdiction of the federal government. *See* 18 U.S.C. § 1001. It is paired with section 2, which is not a substantive law but holds one liable as a principal for aiding and abetting a crime. *See* 18 U.S.C. § 2. In this case the material facts crucial to section 1001 are delineated in that portion of the Bank Secrecy Act found at 31 U.S.C. § 5313 and its implementing regulation, 31 C.F.R. § 103.22(a), which provides that:

(a) Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000.00. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished.

This regulation plainly indicates that *all* the information called for in the form is material. Form 4789 calls for:

Part I: the identity of the individual or organization who conducted the transaction;

Part II: the identity of the individual or organization for whom this transaction was completed (to be completed only if different from Part I);

Part III: the customer's account number;

Part IV: a description of the transaction as to the nature of the transaction, amount, date, denomination of bills, whether the currency is foreign, and whether a check was involved; and

Part IV: the name of the financial institution reporting the transaction.

The defendant relies, in part, on *Gimbel I* to support his argument that Count I does not state an offense under this statutory scheme. *Gimbel I* was dismissed because the court concluded that no provision in the Bank Secrecy Act or Form 4789 required a bank to report the identities of the true owners of the currency involved in a transaction made through a lawyer's client trust account. The government interpreted this as holding that the identities

of the owners are not material facts. *See* Government's Response to Various Motions Filed by the Defendant Dealing with Count One of the Indictment (18 U.S.C. 1001). This court would go farther to say that these "facts" are not required to be reported at all.

Under the present Indictment, the material fact at issue is the amount of the transaction. Form 4789 clearly requires a bank to report the "total amount of the currency transaction." *See* Form 4789, Part IV at 2. According to the facts alleged in Count I, Gimbel concealed or disguised the total amount of his transactions by structuring them—breaking them into amounts of less than $10,000.00. These structured transactions are alleged to have totaled over $10,000.00 in a single day at a single bank.

In dismissing the previous indictment, this court did not reach the question of whether structuring a transaction in this manner is prohibited by the Bank Secrecy Act. Another district court in this circuit noticed this omission while ruling on another money laundering case:

> The defendants rely heavily on *United States v. Gimbel* ... in their vagueness argument as well as in their arguments concerning cognizable violations of the [Bank Secrecy] Act. *Gimbel* is not exactly on point, since the crime alleged there was failure to disclose the real party in interest in defendants' *deposits.* While defendants here, like Gimbel, were acting on behalf of others, they are charged with causing the bank to fail to file CTRs in their *own* names. To the extent that *Gimbel* is broader than we have read it, we decline to follow it....

*United States v. Richter*, 610 F.Supp. 480, 490 n. 17 (N.D.Ill.1985) (citations omitted).

*Gimbel I* is not broader than the *Richter* court read it. It does not say that a customer who structures currency transactions so that a financial institution will fail to file a CTR on behalf of that customer is not violating the law. In this respect the defendant's reliance on *Gimbel I* is misplaced. Under the present Indictment the court must reach this question because Gimbel is now charged with causing a bank to fail to file CTRs for his law firm's trust account.

As noted above, the Bank Secrecy Act requires that the "total amount of the currency transaction" be reported on Form 4789. This amount must be reported by the financial institution, not the customer. The defendant argues that the statutory scheme does not prohibit a customer from making multiple transactions totalling over $10,000.00 in the course of one day. He believes that this is a course of conduct not expressly addressed by the Bank Secrecy Act which imposes no clear duty on the financial institution to aggregate all the transactions a customer makes in the course of a day.

The government points out that Form 4789 was amended in 1980 to include a provision stating that:

> Each financial institution must file a Form 4789 for each deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to that financial institution, which involves a transaction in currency of more than $10,000. Multiple transactions by or for any person which in any one day total more than $10,000 should be treated as a single transaction, if the financial institution is aware of them.

This form is prepared by the United States Department of the Treasury for use by the financial institution. One case has stated that it is not a part of the Code of Federal Regulations and is thus not binding on financial institutions. *See United States v. $200,000 in United States Currency*, 590 F.Supp. 866 (S.D.Fla.1984). The defendant says that because this provision imposes no legal duty, he cannot be charged with causing a bank not to fulfill a duty which it does not have.

When defendants made this same argument in *United States v. Richter*, the court reasoned that:

> This argument contains one fatal flaw, it silently mischaracterizes the alleged offense. The alleged offense is inten-

tionally causing the bank to not file a CTR. What *caused* the failure was the act of breaking up the large sums into smaller ones. Under § 2, it is *these* acts, "if directly performed by" bank officials which would violate § 5313. Defendants' argument silently assumes that the alleged crime is something else: failure to file a CTR when a depositer comes in with multiple deposits of more than $10,-000. They focus on whether the bank officials had a duty to file a CTR had they known that defendants had come in with multiple deposits of more than $10,-000. The defendants thus focus on a later part of the time line. Even if the bank had no duty to file a CTR in the multiple deposit situation, *the crime had already been committed;* the defendants had intentionally structured their transactions to evade the reporting requirements of the Act. The crime was breaking up the deposits to cause the bank to fail to file a CTR where it would have done so had the deposits not been broken up. The relevant duty—the existence of which is not disputed—is the duty of the bank to file CTRs for single deposits of more than $10,000. The defendants allegedly caused the bank not to fulfill *this duty.* The other, later "duty"—whether the bank is required to report transactions *already* broken into increments—is irrelevant here. It does not matter whether the defendants caused the bank to fulfill this possible duty.

*Richter,* 610 F.Supp. at 489–90.

This court believes that the *Richter* court took the correct approach in evaluating the gravamen of the crime in question and adopts its reasoning in this case. The defendant points out that the *Richter* opinion relied, in part, on the district court opinion in *United States v. Anzalone,* No. 84–68–MA, slip op. at 19–20 (D.Mass. July 2, 1984), which was later reversed by the First Circuit. *See United States v. Anzalone,* 766 F.2d 676 (1st Cir.1985). However, there is a crucial factual distinction. In *Anzalone* the defendants made structured transactions adding up to over $10,-

000.00 over the course of several days. *Id.* at 683–84 (Aldrich, J., concurring). The court of appeals concluded that the Bank Secrecy Act gave no warning that this type of conduct was illegal. *Id.* at 682. Even under Form 4789, as amended, a bank would not have a duty to aggregate the amount of transactions occurring on more than one day. Thus, *Anzalone* is of no help to Gimbel in his situation.

The *Richter* decision recognizes that even without the amendment to Form 4789 the bank had a duty not to disguise or conceal the amounts of currency transactions. Arguing, as Gimbel does, that the amendment is invalid actually leads more surely to the conclusion that structuring a transaction is illegal. If a bank is not obliged to aggregate deposits or withdrawals, it is more likely that a scheme to conceal by structuring will succeed.

■ Through the operation of the aiding and abetting statute, 18 U.S.C. § 2, a customer who structures transactions to conceal the necessity for filing a CTR is liable as a principal for causing a bank's failure to file. This was the situation in *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979), where a bank chairman prepared five separate loan notes, each in the amount of $9,000, then distributed the total cash proceeds to a drug dealer. The chairman's bank did not file a CTR for the transaction and the chairman was subsequently convicted of concealing material facts from the government. In reading this case, the defendant suggests that it was the fact that the chairman, a bank officer, had a fiduciary duty to his employer that made him liable. The defendant is attempting to import the concept of fiduciary fraud into this section 1001 charge and say, in effect, that the duty to disclose arises only when there is a fiduciary relationship between the defendant and the financial institution. This argument rests on the faulty premise that Gimbel is being charged with mere failure to disclose and that no affirmative acts were involved in his scheme. *See Defendant's Memoran-*

*dum in Support of His Motion to Dismiss the Indictment* at 34–35. The court disagrees. While nondisclosure entails a passive failure to act, active concealment can require affirmative acts. The difference is best illustrated by the two *Gimbel* indictments. The first was dismissed because the court found that neither the defendant nor the financial institution had a duty to report the names of the clients whose funds Gimbel was depositing into or withdrawing from his law firm trust account. No affirmative acts such as using false names were necessary to disguise the true owners of the currency because Gimbel was using the vehicle of his client trust fund, which for purposes of bank records is maintained only in the name of the law firm. Under the facts of the second Indictment, the defendant is charged with structuring transactions to disguise the total amount, thereby preventing a CTR from being filed on behalf of the trust account. Structuring is an affirmative act aimed at concealment. To structure a transaction a hypothetical customer must make several trips to a bank, enter, stand in line and conduct business at a teller window several times in one day. Such conduct cannot be fairly described as simple failure to act. It is not mere silence in the face of an unasked question. *See United States v. London*, 550 F.2d 206, 212 (5th Cir.1977); *United States v. Richter*, 610 F.Supp. 480, 489 (N.D.Ill.1985). One need not be a party to a fiduciary relationship to have a duty not to take affirmative steps to conceal.

■ Under the facts alleged in the Indictment, the amount of a currency transaction was a material fact which the financial institution had a duty to report to the government. The defendant is charged with scheming to cause a bank to conceal this material fact. The court, therefore, concludes that Count I of the Indictment does state an offense under 18 U.S.C. §§ 1001 and 2 and will not be dismissed for failure to do so.

Having decided that Count I of the Indictment does state an offense cognizable under 18 U.S.C. §§ 1001 and 2, the court will deal with the defendant's contention that these statutes did not give him fair warning that his conduct was prohibited. A criminal statute offends due process if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. General Construction Company*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), or is "so empty of meaning that no one desirous of obeying the law could fairly be aware that he was doing that which was prohibited." *Winters v. New York*, 333 U.S. 507, 524, 68 S.Ct. 665, 674, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting).

■ Despite the defendant's introductory epigram about "words which are vague and fluid," *see* Defendant's Memorandum in Support of His Motion to Dismiss the Indictment at 11, the statutes at issue here are not under attack because they employ political or moral abstractions such as "obscene" or "vagrant," which can mean many things to many people. The issue here is notice, not definitional line-drawing. Moreover, the defendant does not claim that these laws, as applied, impinged upon any other constitutionally protected conduct. *Cf. United States v. Kaatz*, 705 F.2d 1237, 1242 (10th Cir.1983); *United States v. Richter*, 610 F.Supp. 480, 491–93 (N.D.Ill. 1985). Economic regulations are generally subject to less scrutiny for vagueness. However, when criminal sanctions can be imposed, a more stringent test should apply. *See Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982).

Gimbel is charged with a specific intent crime. Section 1001 of Title 18 requires that the government prove beyond a reasonable doubt that the defendant acted knowingly and willfully in concealing material facts from the government. *See United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984). The defendant need now know that he was acting in violation of some law. *See Ellis v. United States*, 206 U.S. 246, 257, 27 S.Ct. 600,

601, 51 L.Ed. 1047 (1907). Nevertheless, "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193.

Vagueness can also be "cured" by resort to legislative and judicial interpretations in effect at the time of the alleged criminal acts. The Indictment charges that Gimbel engaged in structured currency transactions on twelve occasions from May of 1982 through April of 1983. Thus, *United States v. Thompson*, a 1979 decision of the Fifth Circuit, should have warned a person of common intelligence that structuring currency transactions is illegal. *See United States v. Thompson*, 603 F.2d 1200, 1202–04 (5th Cir.1979). In refuting an analogous vagueness challenge, the Fifth Circuit stated:

> Appellant argues that he was entitled to structure a single transaction in currency as multiple loans, thus avoiding the obligation to report pursuant to [§ 5313] and the relevant regulations. Appellant analogizes this to a taxpayer structuring a financial transaction in a certain manner to avoid, rather than evade, the payment of taxes. The analogy is inapposite. Congress has lawfully required reporting of transactions in currency of more than $10,000.00 as an aid to criminal, tax, or regulatory investigations or proceedings. In the instant case, appellant intentionally sought to defeat the statutory requirements by engaging in an unreported transaction in currency of more than $10,000.00. Appellant cannot flout the requirements of [§ 5313] with impunity. The decision to structure a $45,000.00 transaction in currency as five $9,000.00 loans with the intent to annul the reporting requirements does not equate to a decision to structure a financial transaction in a lawful manner so as to minimize or avoid the applicability of a tax covering only specific activity.

*Id.* at 1203–04 (footnote omitted).

▮ The Bank Secrecy Act of 1972 is a body of legislation creating "new" crimes out of acts which are not *malum in se*. Consequently, indictments which incorporate the provisions of the Act by reference have been particularly subject to vagueness attacks. However, acts which are themselves legal lose their legal character when they become elements of an unlawful scheme. *See United States v. Hajecate*, 683 F.2d 894, 896–97 (5th Cir.1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983). In making his vagueness attack, the defendant focuses too narrowly on the individual "innocent" acts. The Indictment alleges that the individual withdrawals and deposits were part of a larger scheme to conceal material information from the Internal Revenue Service. Sections 1001 and 2 of Title 18 together with the provisions of the Bank Secrecy Act give explicit and ample notice that transactions totalling over $10,000.00 must be reported. The government will have to prove at trial that the defendant intended to cause a bank to evade, not avoid, the filing of CTRs. Thus, the court concludes that 18 U.S.C. §§ 1001 and 2, as applied in this case, are not unconstitutionally vague. Count I will not be dismissed on this ground.

The court finds little merit in the defendant's remaining objections to Count I. Count I of the present Indictment is not analytically indistinguishable from Count I of the indictment dismissed in *Gimbel I*. As discussed above, Count I of the first indictment did not state a crime, while Count I of this indictment does.

▮ The defendant also claims that Count I is duplicitous because "the government has intentionally drafted Count I so that it charges, in substance, a broad-based unitary scheme to conceal rather than charging in separate counts the alleged separate multiple acts of concealment subsumed within Count I. The Count thus resembles a conspiracy count with each alleged act of concealment being charged as though it was an overt act." Defendant's Memorandum in Support of His Motion to Dismiss the Indictment at 43b. *See also*

Federal Rules of Criminal Procedure 7(c) and 8(a). Duplicity is the joining in a single count of two or more separate and distinct offenses. *See United States v. Orzechowski*, 547 F.2d 978, 986 (7th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). Duplicitous indictments are prohibited because they make it difficult for a defendant to plead double jeopardy in a subsequent prosecution; they risk prejudice with respect to evidentiary rulings during trial, and they make it difficult to ensure a unanimous jury verdict. *United States v. Dorfman*, 532 F.Supp. 1118, 1128 (N.D.Ill.1981). Count I of this Indictment alleges a single scheme to conceal material facts from the Internal Revenue Service. While each act of structuring currency transactions, if done separately, might constitute a separate offense, that is not determinative. *See United States v. Zeidman*, 540 F.2d 314, 316 (7th Cir.1976). Federal Rule of Criminal Procedure 7(c) which permits a single count to include an allegation that an offense was committed by one or more specified means, "necessarily contemplates that two or more acts, each one of which would constitute an offense standing alone, may be joined in a single count." *United States v. Pavloski*, 574 F.2d 933, 936 (7th Cir.1978). Even though the government might have brought separate charges of concealing material information, the Indictment is structured on the theory that there was a single scheme. If, at trial, the government is able to establish the scheme as to only some of these transactions, this would not be a fatal variance, because the government may choose to prove fewer acts than the Indictment alleges. *See United States v. Miller*, ── U.S. ──, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985). Based on these principles, the court concludes that the charge in Count I comports with the nature of the offense alleged and is not duplicitous. Thus, Count I will not be dismissed on this ground. *See United States v. Konefal*, 566 F.Supp. 698, 702 (N.D.N.Y.1983).

The defendant submitted no argument on his motion to dismiss Count I as impermissibly vague in violation of Federal Rules of Criminal Procedure 7(c)(1) and 12(b)(2). Therefore, this issue will not be examined.

### B. Counts II–VI

Counts II through VI of the Indictment charge Gimbel with using the wires and mails in furtherance of his scheme to defraud the government. *See* U.S.C. §§ 1341 and 1343. It is important to emphasize at the outset that the scheme alleged in these five counts is different from the scheme alleged in Count I. The scheme in Count I was primarily aimed at concealing transactions in currency made through Gimbel's law firm trust account. Counts II through VI allege a two-pronged scheme:

From on or about an exact date unknown in 1978 to on or about May 1983 at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

### STANLEY P. GIMBEL

defendant herein, knowingly and intentionally devised and intended to devise a scheme and artifice to defraud the United States by impeding, impairing, obstructing, inhibiting, frustrating and defeating the lawful governmental functions of the Department of the Treasury in: (A) the collection of data and reports of currency transactions at financial institutions in excess of $10,000.00 for use in criminal, tax and regulatory investigations and proceedings; and (B) the obtaining of accurate and truthful information and data to be used to determine the correct source and amount of income and in the determination and assessment of the revenue, that is, income taxes.

Indictment, Count II at ¶ 2. The nineteen paragraphs which follow this general statement of purpose specify various ways in which Gimbel is supposed to have counseled, assisted or discussed with drug dealers and others various means of concealing currency transactions and taxable income from the IRS.

The defendant is moving the court to dismiss Counts II–VI on the grounds that 18 U.S.C. §§ 1341 and 1343 are unconstitu-

tional as applied and that these counts fail to allege an offense. Gimbel characterizes the alleged scheme as "fiduciary fraud" or "intangible rights fraud," because, in his view, the government was merely deprived of information, not money or property. *See United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1983). In making this argument the defendant relies heavily on *United States v. Richter*, 610 F.Supp. 480 (N.D. Ill.1985), where the court dismissed wire fraud counts of a money laundering charge because "the government simply … failed to show that the defendants owed some *fiduciary* duty to the United States. And the government … failed to cite any *wire fraud* cases imposing liability where no fiduciary duty existed." *Id.* at 495. The *Richter* court, noting that this was a case of first impression, observed that: "so far as we have been able to determine liability under an intangible rights theory hinges on the existence of a fiduciary duty owed by at least one of the schemers to the person or entity defrauded." *Id.* at 494. Likewise, Gimbel states that he "obviously owed no fiduciary duty to the Internal Revenue Service and thus he cannot be indicted under an intangible rights theory…." Defendant's Memorandum in Support of His Motion to Dismiss the Indictment at 54.

In relevant part the mail fraud statute reads:

> Whoever, having devised … any scheme or artifice to defraud … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service … or knowingly causes to be delivered by the Postal Service … or knowingly causes to be delivered by mail … any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341. The wire fraud statute, 18 U.S.C. § 1343, uses substantially the same language, so both statutes have received like treatment by the courts. *See United States v. Feldman*, 711 F.2d 758,

763 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983).

Mail and wire fraud crimes require two essential elements: (1) a scheme to defraud, and (2) use of the wires or mails to execute or further this scheme. *United States v. Elliott*, 771 F.2d 1046, 1049 (7th Cir.1985). The scheme can deprive another of tangible money or property or of intangible rights. *See United States v. Dick*, 744 F.2d 546, 550 (7th Cir. 1984). When a scheme deprives another of intangible rights, courts have required that there be a fiduciary relationship between the schemer and the one defrauded. *See United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1984). This is the method of analysis adopted by the *Richter* court, but for the reasons discussed below it is not determinative of Gimbel's situation.

Summarizing the gravamen of the case before it, the *Richter* court stated that: "The gist of the indictment is that the defendants 'laundered' money by using a scheme to send large sums to Switzerland without alerting the watchful eye of the Internal Revenue Service ('IRS')." *Richter*, 610 F.Supp. at 483. Counts II through VI of the *Gimbel* Indictment describe a much wider scheme. The government asserts that it should be characterized as a hybrid scheme which deprived the government of both information and tax dollars. *See* Government's Response to Issues Dealing with Whether the Indictment Charges a Viable Prosecution Under Title 18, United States Code Sections 1341 and 1343 at 6–9. This dual aspect of the fraud is alleged in Count II of the Indictment which states that the Department of the Treasury was deprived of accurate and truthful information … to be used … in the determination and assessment of the revenue, that is, income taxes." Indictment, Count II at ¶ 2. The government claims that it is prepared to prove the economic effect of this scheme at trial. *See* Affidavit of G. Roger Markley at 5.

It is apparent that the initial thing the government was deprived of was raw information. The *Richter* court did not look

beyond the deprivation of the CTRs. However, if this information had no economic consequences, the IRS would not be trying to collect it and others would not be trying to conceal it. The ultimate aim of a money laundering scheme, such as the one alleged here, is to deprive the government of taxes. The legislative history of the Bank Secrecy Act is replete with statements concerning the need to stop the loss of tax dollars caused by money laundering. *See generally* S.Rep. No. 91–1139 (1970); H.R.Rep. No. 91–975 (1970), U.S.Code Cong. & Admin.News 1970, p. 4394; Hearings on Foreign Bank Secrecy and Bank Records (H.R. 15073) before the House Committee on Banking and Currency, 91st Cong., 1st and 2d Sess. (1969–1970); Hearings on Foreign Bank Secrecy (S. 3678 and H.R. 15073) before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency, 91st Cong., 2d Sess. (1970). The facts in the Indictment must be considered as true at this point, so when the alleged scheme is viewed as a whole—from its individual acts to its ultimate aim—it bears out the government's theory that this is a hybrid type of fraud.

The court in *Richter* declined "to so broaden the wire fraud statute to cover this non-fiduciary case." *Richter*, 610 F.Supp. at 495. However, other courts have not found it necessary to look for a fiduciary duty when a defendant was charged with using the mails to defraud the government of tax information, *see, e.g., United States v. Brewer*, 528 F.2d 492 (4th Cir.1975) or when submitting fraudulent information to a government agency was a prelude to garnering a financial benefit, *see, e.g., United States v. Weatherspoon*, 581 F.2d 595 (7th Cir.1978); *United States v. Allen*, 554 F.2d 398 (10th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977).

Most of the cases requiring a finding of fiduciary duty have arisen in the context of securities violations, *see, e.g., Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); political corruption, *see, e.g., United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461

U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); or labor racketeering, *see, e.g., United States v. Dorfman*, 532 F.Supp. 1118 (N.D.Ill.1981). The intangible right at issue in those cases was the loyal service of employees or public officials, which is more purely an intangible right than information with which to collect taxes. Moreover, statutory law and case law is relatively well developed in the areas of securities fraud and public corruption. By comparison, money laundering is a fairly recent area of law enforcement concern.

Early in this century the Supreme Court stated that: "Congress may forbid any such act done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not," since the "overt act of putting a letter into the post office of the United States is a matter that Congress may regulate." *Badders v. United States*, 240 U.S. 391, 393, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916). More recently, Chief Justice Burger observed that:

> Section 1341 of Title 18 U.S.C. has traditionally been used against fraudulent activity as a first line of defense. When a "new" fraud develops—as constantly happens—the mail fraud statute becomes a stopgap device to deal on a temporary basis with the new phenomenon, until particularized legislation can be developed and passed to deal directly with the evil.

*United States v. Maze*, 414 U.S. 395, 405–06, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974) (Burger, C.J., dissenting). He then pointed out that most prosecutions for securities fraud, loan sharking, real estate fraud, and credit card fraud were brought under the federal mail fraud statute before specific legislation was passed outlawing these crimes.

If ever there was a mode of criminal activity meriting a "first line of defense" or a "stopgap device," it is the crime of money laundering. As this court noted in *Gimbel I*, the Bank Secrecy Act was passed in 1970 mainly to deal with trans-

fers involving off shore banks. The domestic reporting statutes were merely enabling acts which were never fully implemented. In the fifteen years since the Act has been in effect, the government has come to realize that it provides an imperfect prosecutorial tool directed at money laundering. *See United States v. Anzalone,* 766 F.2d 676, 681 (1st Cir.1985). As a result, the Deficit Reduction Act of 1984 includes a provision which places the reporting duty directly on the transactor. *See* Pub.L. No. 98–369, § 146, 98 Stat. 685 (1984). Cases such as Gimbel's, in which the acts took place before this change in the law, still have to be prosecuted by piecing together less specific statutes. Under these circumstances the court believes that it is appropriate to invoke the mail and wire fraud statutes to cover a hybrid fraud without regard to whether the defendant had a fiduciary duty to the victim. Accordingly, Counts II, III, IV, V and VI will not be dismissed for failing to state an offense. The Indictment alleges a scheme and use of the mails and wires in furtherance of that scheme. That is all that is required to state an offense at this point. The court will not dismiss these counts because 18 U.S.C. §§ 1341 and 1343 are unconstitutionally vague as applied for the reasons stated in Part A of this Decision and Order.

## II. RECOMMENDATIONS AND ORDERS OF THE MAGISTRATE

On September 9 and 11, 1985, the magistrate issued Recommendations and Orders dealing with certain motions filed by the parties. The defendant has objected to two of the magistrate's orders of September 9, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 13, § 13.03. These orders denied the defendant's requests that the government:

1. provide any and all grand jury testimony of witnesses the government intends to call at trial; and

2. provide all grand jury minutes.

In response, the government promised to provide all grand jury testimony by September 3, 1985, except case agent material. *See* 18 U.S.C. § 3500. Decisional law in this district requires only that grand jury testimony be available to the defendant twenty-four hours before trial. *See United States v. Nanz,* 471 F.Supp. 968, 971 (E.D. Wis.1979). The government has offered to produce the case agent testimony five days prior to trial. The defendant counters that he has demonstrated particularized need for obtaining the case agent material earlier because: "To delay production until five days before trial will create a hardship on the defense and impede the ability of the defendant to adequately and properly prepare his defense." Defendant's Objection to and Appeal from Magistrate's Recommendation and Order of September 9, 1985 at 3.

The magistrate also denied the defendant's request for production of grand jury minutes pursuant to Federal Rule of Criminal Procedure 6(e)(3)(C)(i) & (ii). In his objection the defendant contends that the government did not present the grand jury with the applicable law and that the instructions on the elements of the offenses charged were inadequate. The defendant suggests that the court make an in camera inspection of the minutes to determine whether these suppositions are true. The magistrate concluded that the defendant's arguments were based on speculation and conjecture and that he had not demonstrated compelling necessity or particularized need for the disclosure strong enough to overcome the presumption of regularity which attaches to all grand jury proceedings. *See United States v. Lisinski,* 728 F.2d 887, 893 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984).

Having reviewed the arguments of the parties and the record as a whole, the court finds the Memorandum and Order of September 9, 1985, to be reasonable and grounded in the applicable law. The court, therefore, adopts the Memorandum and incorporates it herein by reference and ORDERS that:

1. The defendant's motion for production of grand jury minutes IS DENIED.
2. The defendant's motion for early production of case agent material IS DENIED.

In his September 11, 1985 Recommendation and Order, the magistrate dealt with five other motions filed by the defendant. The magistrate ordered:

1. that the defendant's motion to strike prejudicial surplusage in counts two (2) through (6) be denied; and
2. that the defendant's motion to strike the affidavit of G. Roger Markley be denied.

The magistrate also made the following recommendations:

1. that the court issue an order denying the defendant's motion to dismiss the indictment on the grounds of misstating the law and improper jury instruction on the applicable law;
2. that the court issue an order denying the defendant's motion to dismiss counts two through six on the ground that they are unconstitutionally vague; and
3. that the court enter an order denying the defendant's motion to dismiss counts two, three, five, and six on the ground that the use of the wire and mail communications were not for the purpose of executing the alleged scheme.

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Local Rule 13, § 13.03, the parties were given ten days to file objections to the September 11 Recommendation and Order. By letter of September 23, 1985, the defendant requested additional time in which to file an objection, but although the court granted additional time, no objections were filed.

Having reviewed the record as a whole, the court finds the magistrate's Recommendation and Order of September 11, 1985 to be reasonable and grounded in the applicable law. The court, therefore, adopts the reasoning and conclusions of the magistrate and incorporates the Recommendation and Order herein by reference— with one caveat. In discussing the defendant's motion to dismiss because the mailing alleged in Count V was not in furtherance of the scheme to defraud, the magistrate said:

[T]he defendant contends with regard to count five (5) that the mailing of the CTR was antithetical to the alleged scheme. This assertion might be persuasive if the scheme alleged was merely one to evade the filing of CTRs, but the alleged scheme is not that simple. Part of the alleged scheme was to prevent the IRS from obtaining truthful and accurate information about the correct source and amount of income of the defendant's clients by the defendant's handling of currency transactions for his clients in such a way that the transactions could not be linked with them (See Paragraphs eight [8], twelve [12], fourteen [14], and sixteen [16] of count two [2], which are incorporated into each subsequent count.) Thus the mailing of a CTR linking Gimbel, but not the client on whose behalf he negotiated the transaction, with a currency transaction would be in furtherance of the scheme. Additionally the count is sustainable because the mailing is a "normal concomitant" of a $10,000 transaction at a bank, and was reasonably foreseeable.

Magistrate's Recommendation to the Honorable Thomas J. Curran and Order Re: Motions to Dismiss and to Strike at 18–19.

The court agrees with the magistrate's reasoning in this paragraph, provided that the government remains bound by *Gimbel I* in which the court said that the laws did not require Gimbel to disclose the names of his clients when making a transaction in currency through his law firm's trust account. In all other respects, the magistrate's recommendations will be adopted.

Accordingly, the court ORDERS that:

1. the defendant's motion to strike prejudicial surplusage in counts two (2) through (6) IS DENIED;

2. the defendant's motion to strike the affidavit of G. Roger Markley IS DENIED;

3. the defendant's motion to dismiss the indictment on the grounds of misstating the law and improper jury instruction on the applicable law IS DENIED;

4. the defendant's motion to dismiss counts two through six on the ground that they are unconstitutionally vague IS DENIED; and

5. the defendant's motion to dismiss counts two, three, five, and six on the ground that the use of the wire and mail communications were not for the purpose of executing the alleged scheme IS DENIED.

### III. SUMMARY OF ORDERS

For the reasons discussed in Part I of this Decision and Order, the court ORDERS that all of the defendant's motions to dismiss this Indictment ARE DENIED.

### APPENDIX A

#### Indictment

#### Count One

The GRAND JURY charges:

1. At all times pertinent to the Indictment herein:

a. Transactions in currency were defined as transactions involving the physical transfer of currency from one person to another, as stated in pertinent part in Title 31, Code of Federal Regulations, Section 103.11.

b. Financial institutions were required to file a report for each deposit, withdrawal, exchange of currency of any country or other payment or transfer, by, through, or to such financial institution, which was a transaction in currency of more than $10,-000.00, as stated in pertinent part in Title 31, United States Code, Section 5313 (formerly 1081) and Title 31, Code of Federal Regulations, Section 103.22(a).

c. Prior to July 1980 reports of currency transactions, as described above, were required to be filed on or before the 45th day following the day on which the reported transaction occurred. After July 1980 these reports were required to be filed on or before the 15th day following the day on which the reported transaction occurred. Filing was to be made with the Internal Revenue Service on the form prescribed, that is, IRS Form 4789, a Currency Transaction Report. The reports were required to furnish all information called for in such form, as stated in pertinent part in Title 31, Code of Federal Regulations, Section 103.-25.

d. A Currency Transaction Report (IRS Form 4789) required, among other items, the identity of the individual who conducted the transaction with the financial institution in "Part I" and the individual or organization for whom the transaction was completed in "Part II".

e. A financial institution was required to verify and record the name and address of the individual presenting a transaction in currency, as previously described, as well as the identity of any person or entity for whose or which account such transaction was to be effected, as stated in pertinent part in Title 31, Code of Federal Regulations, Section 103.26.

f. Reports of currency transactions, as previously described herein, were required to be made for use in criminal, tax and regulatory investigations and proceedings, as stated in pertinent part in Title 31, United States Code, Section 5311 (formerly 1051) and Title 31, Code of Federal Regulations, Section 103.21.

g. After filing, these Reports were available for investigative purposes to any other department or agency of the United States such as the Federal Bureau of Investigation, the Drug Enforcement Administration, the United States Customs Service, etc., upon the request of the head of such department or agency in accordance with federal regulation, as stated in pertinent part in Title 31, Code of Federal Regulations, Section 103.43.

h. Financial institutions had a duty and were required to file a Currency Transaction Report (IRS Form 4789) for multiple deposits, withdrawals, transfers and exchanges of currency that involved the same person and exceeded an aggregate amount of $10,000.00 in one day at the institution, if the institution was aware that the transaction total exceeded $10,000.00.

i. All persons involved in a transaction in currency exceeding $10,000.00 had a duty not to act in any manner to intentionally and unlawfully evade, inhibit, preclude or prevent the filing of an accurate Currency Transaction Report, or impede, impair, frustrate, inhibit, obstruct and defeat the currency laws and regulations stated above.

j. The First Bank-Milwaukee was a financial institution, as defined by Title 31, United States Code, Section 5312 (formerly 1052) and Title 31, Code of Federal Regulations, Section 103.11.

k. STANLEY P. GIMBEL, defendant herein, was an attorney engaged in the practice of law in the state of Wisconsin and was a person as defined by Title 31, United States Code, Section 5312 (formerly 1052) and Title 31, Code of Federal Regulations, Section 103.11.

l. STANLEY P. GIMBEL was a customer at First Bank-Milwaukee and his currency transactions at that bank were not exempt from being reported to the Internal Revenue Service within the meaning of Title 31, Code of Federal Regulations, Section 103.22(b).

m. STANLEY P. GIMBEL had signature authority over and used the trust account of the Gimbel, Gimbel and Reilly law firm at First Bank-Milwaukee. Said account also was not exempt from currency reporting requirements within the meaning of Title 31, Code of Federal Regulations, Section 103.22(b).

n. Special Agents Walter Perry and Leonard Shelton of the Internal Revenue Service used the names "Vince Solano" and "Leonard Saunders" respectively in an official undercover capacity.

2. From on or about an exact date unknown in 1978 to on or about January 1984 at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

STANLEY P. GIMBEL,

defendant herein, did knowingly, willfully and intentionally conceal and cover-up, and cause to do so, by trick, scheme and device, material facts within the jurisdiction of an agency or department of the United States, that is, the United States Department of the Treasury, Internal Revenue Service.

3. The aforementioned material facts included but were not limited to the following:

a. STANLEY P. GIMBEL on numerous occasions was engaged in transactions in currency, each of which transaction was in an amount in excess of $10,000.00 in one day that was deposited into the Gimbel, Gimbel and Reilly law firm trust account at First Bank-Milwaukee; and

b. STANLEY P. GIMBEL caused currency transfers in excess of $10,000.00 in one day to be transacted through the above-mentioned trust account at First Bank-Milwaukee.

4. It was a part of the concealment and coverup by trick, scheme and device to prevent, preclude and inhibit any government agency from knowing that STANLEY P. GIMBEL was engaged in numerous transactions in currency in excess of $10,-000.00 in a single day at a financial institution and that this currency was being transferred by the defendant through the Gimbel, Gimbel and Reilly law firm trust account at First Bank-Milwaukee, in order to conceal and cause to be concealed from the government the existence, source and transfer of currency well in excess of $100,000.00.

5. It was a further part of the concealment and coverup by trick, scheme and device that STANLEY P. GIMBEL would and did:

a. misuse the Gimbel, Gimbel and Reilly law firm trust account at First Bank-Milwaukee to conceal and cover-up material

facts from the United States government that were to be used by the government in criminal, tax and regulatory investigations and proceedings, particularly in relation to persons engaging in criminal activity;

b. artificially structure a currency transaction amount in excess of $10,000.00 in one day into ostensibly separate deposits under $10,000.00 each in order to evade, circumvent, prevent, preclude and inhibit the reporting of currency transactions to the Internal Revenue Service;

c. counsel, advise and discuss with persons including but not limited to Robert Breska (a person known by GIMBEL to traffic in narcotics) and "Vince Solano" (who in reality was an undercover agent of the Internal Revenue Service) and cause and attempt to cause those persons to act thereon to: (1) evade the currency transaction reporting requirements by splitting up currency exceeding $10,000.00 into amounts less than $10,000.00 for purposes of, including but not limited to, depositing currency or exchanging currency in bills in small denominations for larger denominations at a financial institution; (2) use false names and identification when opening bank accounts and when endorsing checks; and (3) and report income to the Internal Revenue Service in an amount different than the amount actually received by a person in conjunction with keeping traceable financial transactions, such as transactions in currency over $10,000.00, to a minimum in the manner described in (2) and (3) of this subparagraph herein.

6. It was a further part of the concealment and coverup by trick, scheme and device that on or about May 17, 1982, May 18, 1982, June 10, 1982, November 12, 1982, November 15, 1982, February 22, 1983, March 2, 1983, March 7, 1983, March 25, 1983, April 14, 1983, April 15, 1983, and April 19, 1983, and on other occasions known and unknown to the Grand Jury, STANLEY P. GIMBEL would and did on each occasion participate in a currency transaction at First Bank-Milwaukee by intentionally and artificially structuring a currency amount in excess of $10,000.00

into multiple deposits that were individually less than $10,000.00 for the purpose of concealing and covering up the material facts that each of those transactions exceeded $10,000.00 in United States or Canadian currency on each occasion.

In violation of Title 18, United States Code, Section 1001 and 2.

## Count Two

The GRAND JURY further charges:

1. Paragraph (1) in its entirety of Count One of this Indictment is realleged herein as if fully set forth.

2. From on or about an exact date unknown in 1978 to on or about May 1983 at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

### STANLEY P. GIMBEL,

defendant herein, knowingly and intentionally devised and intended to devise a scheme and artifice to defraud the United States by impeding, impairing, obstructing, inhibiting, frustrating and defeating the lawful governmental functions of the Department of the Treasury in: (A) the collection of data and reports of currency transactions at financial institutions in excess of $10,000.00 for use in criminal, tax and regulatory investigations and proceedings; and (B) the obtaining of accurate and truthful information and data to be used to determine the correct source and amount of income and in the determination and assessment of the revenue, that is, income taxes. The scheme and artifice to defraud was in substance as follows:

3. It was a part of the scheme and artifice that STANLEY P. GIMBEL would and did engage in the activity described in paragraphs 4 to 20 inclusive herein to assist persons who were involved in the distribution of marijuana and cocaine and a person known to him as Vince Solano in keeping their identifiable and traceable business and currency transactions to a minimum, so that the government, particularly the Internal Revenue Service, would not be able to properly determine informa-

tion about the true extent of their currency movements and potentially taxable income through any investigation of them and of their potential illegal and illicit activities.

4. It was further a part of the scheme and artifice that STANLEY P. GIMBEL would and did participate in numerous currency transactions and cause currency transactions to take place at First Bank-Milwaukee and American State Bank in Kenosha on behalf of various persons described in paragraph 3 above and others, as well as for himself, in a manner that evaded their reporting to the Internal Revenue Service as required by law and regulation.

5. It was further a part of the scheme and artifice that STANLEY P. GIMBEL would and did engage in numerous conversations and have meetings with persons who were actual clients or were portraying themselves as clients concerning the surreptitious handling of currency transactions and the improper and unlawful calculation and determination of their taxable income.

6. It was further a part of the scheme and artifice that in 1978 and 1979 Robert Breska possessed currency from his narcotics dealings and STANLEY P. GIMBEL would and did discuss with Robert Breska how Breska could and would evade Currency Transaction Reports while exchanging currency in bills of smaller denominations for larger denominations. GIMBEL would and did further discuss what amount of income Breska would and did inaccurately and unlawfully report on a 1978 tax return filed by Breska and prepared by GIMBEL.

7. It was further a part of the scheme and artifice that STANLEY P. GIMBEL would and did engage in currency transactions, that is, deposits and transfers, each in excess of $10,000.00, on behalf of persons engaged in illegal and illicit activity from 1978 to 1983.

8. It was further a part of the scheme and artifice that STANLEY P. GIMBEL in August and September 1982 would and did inform Vince Solano that GIMBEL could handle a currency transaction for Solano in such a way that the transaction would not be connected to or associated with Solano and further advised Solano to limit banking or business transactions that were traceable.

9. It was further a part of the scheme and artifice that STANLEY P. GIMBEL in August, September and October 1982 would and did discuss and agree to receive for Solano a $125,000.00 wire transfer from Switzerland into the trust fund account of the law firm of Gimbel, Gimbel and Reilly at First-Bank Milwaukee in Milwaukee, Wisconsin.

10. It was further a part of the scheme and artifice that STANLEY P. GIMBEL in September and October 1982 would and did discuss and agree to distribute the proceeds of the above mentioned wire transfer in currency to Solano and to Leonard Saunders, an alleged associate of Solano's, in a manner that was calculated to prevent, inhibit and preclude the tracing and association of the transfer and distribution to Solano or his associate Saunders, and in such a fashion that neither Solano's name nor Saunders' name would be associated with the transaction.

11. It was further a part of the scheme and artifice that STANLEY P. GIMBEL on or about September 29, 1982, would and did receive a wire transfer for Solano from Switzerland in the amount of $125,000.00, which amount went into the above mentioned law firm bank account, and GIMBEL thereafter made arrangements to distribute $117,500.00 of the proceeds to Solano through Saunders.

12. It was further a part of the scheme and artifice that STANLEY P. GIMBEL would and did accomplish the distribution of $117,500.00 through the above mentioned account in October 1982 by the following: (A) causing eleven cashier's checks to be drawn from that account, each in the amount of $9999.00, made payable to STANLEY P. GIMBEL after GIMBEL unsuccessfully attempted to have the checks made payable to "cash"; (B) delivering the checks and $7,511.00 in currency to Saunders after Saunders used the pre-deter-

mined code word "Placko"; (C) cashing the eleven checks at First Bank-Milwaukee; (D) assisting in filling out a Currency Transaction Report (IRS Form 4789) at that bank wherein he listed the Gimbel, Gimbel and Reilly law firm trust account as the individual or organization for whom the transaction of cashing the checks was completed rather than Vince Solano or Leonard Saunders; (E) and hand-delivering $109,-989.00 in currency, the proceeds of cashing the eleven checks for $9999.00 each, to Saunders.

13. It was further a part of the scheme and artifice that STANLEY P. GIMBEL in October 1982 would and did discuss with Solano and Saunders the following ways in which the currency distribution of the above-mentioned $117,500.00 could be effected: (A) the use of multiple checks in amounts under $10,000.00; (B) the possible cashing of some checks at a bank in Kenosha, Wisconsin; (C) the cashing of those checks to evade a Currency Transaction Report, as well as the use of "bogus" and false names on those checks.

14. It was further part of the scheme and artifice that STANLEY P. GIMBEL would and did preclude, inhibit and prevent any banking or business entity from having any knowledge or records that would or could identify Vince Solano or Leonard Saunders as the recipients of the above mentioned $117,500.00, in order to and intending to prevent, preclude and inhibit any government agency, in particular the United States Department of Treasury, Internal Revenue Service, from: (A) having any knowledge or record of the distribution of United States currency to Vince Solano through the Gimbel, Gimbel and Reilly law firm account that could be used by the government to learn about Solano's true interest in the currency transaction conducted by GIMBEL: (B) and from initiating an investigation of Solano, the transaction and GIMBEL's relation to either.

15. It was further a part of the scheme and artifice that in order to further circumvent and evade the laws and regulations concerning the reporting of currency trans-

actions, STANLEY P. GIMBEL in November 1982 would and did discuss with Vince Solano the purchase of cashier's checks with $92,000.00 in currency in amounts of less than $10,000.00 each at financial institutions in Chicago, Illinois, to enable Solano to surreptitiously wire transfer the $92,-000.00 in United States currency from the United States to locations outside of the United States such as Switzerland and the Cayman Islands without any trace to Solano or Currency Transaction Report in the name of Solano. GIMBEL further stated to Solano that Solano should not deposit the $92,000.00 to GIMBEL's law firm trust account in order to preclude the arousal of suspicion and the possible tracing of the currency to Solano through GIMBEL and the account.

16. It was further a part of the scheme and artifice that in order to assist in the circumvention and evasion of federal income tax laws STANLEY P. GIMBEL in November 1982 would and did discuss with Vince Solano the reporting of Solano's taxable income in an amount different than what he actually received, that is, the amount that Solano "surfaced" rather than the actual amount that Solano received, in order to prevent the government from obtaining truthful and accurate information and data to be used in the correct determination and assessment of Solano's potential income taxes.

17. It was further a part of the scheme and artifice that in order to further circumvent and evade the laws and regulations concerning the reporting of currency transactions, STANLEY P. GIMBEL in February 1983 would and did discuss with Vince Solano the opening of a bank account in Chicago in a false, "bogus" name, which action would have created false bank documents, and the depositing of currency in amounts under $10,000.00 into that account, to enable Solano to surreptitiously transfer United States currency from the United States to the Cayman Islands, a location outside the United States, and from there to Houston, Texas without any trace other than the false name of the bank

account. GIMBEL initially stated to Solano to transfer the currency to GIMBEL's law firm trust account after Solano had deposited it into an account in a false name, that is "Gunther Wohl," a person Solano told GIMBEL was dead, so that GIMBEL could re-transfer the currency out of the United States on Solano's behalf. GIMBEL later stated to Solano to wire transfer the currency directly himself from the "Gunther Wohl" account in order to preclude the arousal of suspicion and the possible tracing of the currency to Solano through GIMBEL and the account.

18. It was further a part of the scheme and artifice that in order to further prevent, preclude and inhibit any government agency from connecting Vince Solano to any additional taxable income that could "surface" as the result of bank records and from connecting Vince Solano, Leonard Saunders and STANLEY P. GIMBEL together in the previously mentioned wire transfer from Switzerland and distribution of $117,500.00, GIMBEL and Solano would and did have telephone discussions in April 1983.

19. In furtherance of the aforesaid scheme and artifice to defraud, the defendant STANLEY P. GIMBEL from 1978 to 1983 caused the interstate movement of payments and the collection of checks through the United States mail to be made on behalf of those persons described in paragraph 3 herein, as well as for himself.

20. In furtherance of the aforesaid scheme and artifice to defraud, the defendant STANLEY P. GIMBEL from August 1983 engaged in interstate telephone conversations and face to face meetings with Vince Solano and Leonard Saunders. These conversations and meetings involved geographical locations in Wisconsin, Illinois, California, Missouri and Hawaii.

21. On or about August 13, 1982, at Milwaukee in the Eastern District of Wisconsin and elsewhere,

STANLEY P. GIMBEL,

defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud, knowingly did cause to be transmitted in interstate commerce, by means of wire communication, certain writings, signs and signals, that is, a telephone call from Milwaukee, Wisconsin to St. Louis, Missouri.

In violation of Title 18, United States Code, Section 1343.

## Count Three

The GRAND JURY further charges:

1. Paragraphs 1 through 20 of Count Two are realleged herein as if fully set forth.

2. On or about September 29, 1982, at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

STANLEY P. GIMBEL,

defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud, knowingly did cause to be transmitted in interstate and foreign commerce by means of wire communication, certain writings, signs and signals, that is, a wire transfer of funds from Union Bank of Switzerland, Zurich, Switzerland to First Bank-Milwaukee, Milwaukee, Wisconsin.

In violation of Title 18, United States Code, Section 1343.

## Count Four

The GRAND JURY FURTHER charges:

1. Paragraphs 1 through 20 of Count Two are realleged herein as if fully set forth.

2. On or about October 4, 1982, at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

STANLEY P. GIMBEL,

defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud, knowingly did cause to be transmitted in interstate commerce by means of wire communication, certain writings, signs and signals, that is, a telephone call from

Milwaukee, Wisconsin to San Francisco, California.

In violation of Title 18, United States Code, Section 1343.

### Count Five

The GRAND JURY further charges:

1. Paragraphs 1 through 20 of Count Two are realleged herein as if fully set forth.

2. On or about October, 1982, at Milwaukee, in the Eastern District of Wisconsin, and elsewhere,

### STANLEY P. GIMBEL,

defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud and attempting to do so, knowingly did cause the First Bank-Milwaukee to place in an authorized depository for United States mail an envelope containing a completed Currency Transaction Report (I.R.S. Form 4789) for the cashing of eleven cashiers checks in the amount of $9,999.00 each by STANLEY P. GIMBEL, the envelope bearing directions thereon for delivery, which envelope the defendant caused to be mailed by First Bank-Milwaukee to the Internal Revenue Service in Philadelphia, Pa.

In violation of Title 18, United States Code, Section 1341.

### Count Six

The GRAND JURY further charges:

1. Paragraphs 1 through 20 of Count Two are realleged herein as if fully set forth.

2. On or about December 14, 1982, at Milwaukee, in the Eastern District of Wisconsin and elsewhere,

### STANLEY P. GIMBEL,

defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud, knowingly did cause to be transmitted in interstate commerce by means of wire communication, certain writings, signs and signals, that is, a telephone call from Milwaukee, Wisconsin to Los Angeles, California.

In violation of Title 18, United States Code, Section 1343.

A TRUE BILL:

_____
FOREPERSON

_____
SPECIAL ATTORNEY
United States Department of Justice