**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Moises Orozco JIMENEZ,**
**Defendant-Appellant.**

**No. 79–5326.**

United States Court of Appeals,
Fifth Circuit.

July 28, 1980.

Abel Toscano, Jr., Larry Warner, Harlingen, Tex., for defendant-appellant.

James R. Gough, Asst. U:S. Atty., Houston, Tex., for plaintiff-appellee.

Before WISDOM, GOLDBERG and HENDERSON, Circuit Judges.

GOLDBERG, Circuit Judge:

Moises Orozco Jimenez appeals from his conviction for conspiracy to possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Jimenez claimed in the trial of the case that he had withdrawn from the conspiracy prior to the commission of any overt act and claims now that his withdrawal was established both by the testimony of the Government's major witness and by that of his witnesses. His primary claims of error here are that the district court applied an improper legal standard in denying his motions for acquittal, based on the withdrawal defense, at the end of the Government's case and again at the end of his defense, and that the district court improperly instructed the jury on the withdrawal defense. We find no reversible error in the district court's actions and therefore affirm the judgment below.

## I.

We set out briefly the factual background of this appeal. Testimony at the trial showed that Special Agent Lex Henderson of the Drug Enforcement Administration, working undercover, made contact with Mario Barbosa-Silva on January 11, 1979, through the purchase of almost four hundred Quaaludes. In their discussions on that date, Barbosa-Silva told Agent Henderson that he had a "man" who had connections for kilogram quantities of cocaine and who would supply him financial backing. Further, Barbosa-Silva and Agent Henderson discussed the possibility of establishing an ongoing cocaine business. On January 16, 1979, Agent Henderson met again with Barbosa-Silva, and Barbosa-Silva proposed to introduce him to his "man."

They then drove to Jimenez' apartment, and Jimenez joined them in Agent Henderson's car.

In the discussions that followed in the car, Jimenez, according to the testimony of both Agent Henderson and Barbosa-Silva, affirmed that he could supply cocaine in the quantities previously promised by Barbosa-Silva. Agent Henderson testified that Jimenez told him that he had already put in a call to his sources regarding the proposed transaction and that he wanted up to six weeks to make delivery. Further, both Agent Henderson and Barbosa-Silva testified that at the end of this meeting Jimenez instructed Agent Henderson to make his future contacts with Barbosa-Silva.

After this meeting on January 16, Agent Henderson had only one other conversation with Jimenez. Approximately six days after the meeting in the car, Agent Henderson placed a call to Barbosa-Silva in his apartment. Jimenez, who was present in the apartment, came on the phone after hearing the identity of the caller. According to Agent Henderson, Jimenez

> told me at that time that he wished to extract himself from the deal; that he was no longer in the deal. That is it, basically it.

> . . . . .

> He just said that he did not wish to be in the deal any further and that he wanted out of the deal, and that I would deal with Silva further; the rest of the deal would be with Silva; that he was no longer in it.

> I cannot recall his exact words, but that was the gist of it.

Trial Transcript at 55.

On January 25, 1979, Barbosa-Silva delivered to Agent Henderson samples of cocaine and Quaaludes in preparation for the consummation of their deal, and they conducted further negotiations. Then, on January 28, 1979, federal agents arrested Barbosa-Silva and an accomplice, Genaro Barrerra Villareal, as they attempted to deliver one kilogram of cocaine to Agent Hender-

son. Barbosa-Silva testified that Jimenez was not the source of this kilogram of cocaine, but rather that it came from Villareal and Rosbel Salinas-Guerra, both of whom were indicted along with Barbosa-Silva and Jimenez.

## II.

### A. The Standards for Withdrawal from a Conspiracy

The Supreme Court last addressed the standards for establishing withdrawal from a conspiracy in *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). There the Government charged that the defendants had engaged in a complex price-fixing conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Defendants contended, *inter alia*, that, even if a conspiracy were proven in the first instance, their resumption of vigorous price competition during the period covered by the indictment could be considered by the jury as indicating that they had withdrawn from the conspiracy. *United States Gypsum, supra*, 98 S.Ct. at 2870. Although the trial judge allowed defendants to argue this theory to the jury, he refused to include it in his instructions. Instead, he charged the jury in the following terms:

> In order to find that a defendant abandoned or withdrew from a conspiracy prior to December 27, 1968, you must find, from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. To withdraw, a defendant *either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence or he must make disclosures of the illegal scheme to law enforcement officials.* Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete

disassociation from the unlawful enterprise.

*Id.* at 2887 (Emphasis in original).

The Court held these instructions improper. In its view, this charge, "fairly read, limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy;" i. e., affirmatively notifying each other member of the conspiracy of his withdrawal or disclosing the illegal scheme to law enforcement officials. The instructions were thus too narrow to allow the jury to consider defendants' claim that withdrawal was established by their resumption of competitive behavior. As the Court noted, "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Id.* The Court held that at the new trial a broader instruction was required so that the jury could determine whether defendant's actions amounted to withdrawal. *Id.*

The *Gypsum* case thus stands at least for the proposition that "[w]ithdrawal from a conspiracy may be demonstrated in a variety of ways." *United States v. Richardson*, 596 F.2d 157, 163 n. 10 (6th Cir. 1979). In general terms, a defendant must demonstrate that he took "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators . . . ." *United States Gypsum, supra*, 98 S.Ct. at 2887.

### B. Motions for Acquittal

Jimenez claims here that the trial court applied too strict a definition of withdrawal in ruling on his motions for acquittal. He made his motions for acquittal on the ground that the evidence established as a matter of law that he had completely withdrawn from the conspiracy. In denying his motions, the district court determined that there existed a question of fact, to be decided by the jury, whether the

evidence actually established his withdrawal. We agree with the lower court's ruling.[1]

■ In the motion made at the end of the Government's case, Jimenez argued that his statement over the phone to Agent Henderson, to the effect that "he wanted out of the deal, and that [Agent Henderson] would deal with Silva further," was an affirmative act which demonstrated his intent to extricate himself from the conspiracy. As the district court recognized, however, this statement was ambiguous at best. In denying the motion, the court pointed to Agent Henderson's testimony that in the conversations in the car on January 16, 1979, Jimenez had instructed him to carry on his future negotiations with Barbosa-Silva. It also noted Agent Henderson's testimony that, in the subsequent phone conversation, after telling Agent Henderson that he wanted out of the deal, Jimenez repeated his instructions to deal with Silva in the future. As the Government argued to the trial court at that time, Jimenez' statements were subject to the interpretation that "he was, in effect, saying 'Deal with my "little man." If he gets caught, it's his scheme.'" Trial Transcript at 116.

At this point the trial court spelled out the basis for its ruling:

THE COURT: Well, if he hadn't told Henderson to keep on dealing with Barbosa-Silva, I think he would be out of the case. But, apparently, he told him at one time, "You deal with Silva." And then, later on, in the telephone conversation, he said, "I don't want anything to do with this thing, so you do all your deals with Silva."

Id. at 117. These instructions to Agent Henderson to keep on dealing with Barbosa-Silva, the court ruled, created a question of fact as to whether Jimenez did actually separate himself from the conspiracy. If Jimenez' statements to Agent Henderson were not "[a]ffirmative acts inconsistent with the object of the conspiracy," United States Gypsum, supra, 98 S.Ct. at 2887, then Jimenez was not entitled to a judgment of acquittal at this stage. We agree with the trial court that the import of these statements was a matter for the jury to decide in the context of the entire case, and we cannot conclude that that court applied an improper legal standard.[2]

Our conclusion that there existed a question of fact as to the meaning of Jimenez' actions, even under the United States Gypsum standard, applies also to the motion for acquittal at the end of all the evidence. As indicated, Barbosa-Silva who testified for the defense, corroborated almost all of Agent Henderson's testimony as to what transpired in the meeting in the car on January 16, including Jimenez' directions that future contacts were to be made through Barbosa-Silva. While Barbosa-Silva did testify that Jimenez had no connection with the cocaine transaction which led to the arrests, Agent Henderson had previously testified that Barbosa-Silva had told him that Jimenez was "my money." Trial

---

1. Jimenez' contentions here could be characterized as an attack on the sufficiency of the evidence to support his conviction. As this court has stated, "A jury's verdict 'must be sustained, if there is substantial evidence, taking the view most favorable to the Government, to support it.' . . . If a reasonable jury could decide that the evidence is not consistent with any theory of defendant's innocence, it is sufficient. . . ." United States v. Wentland, 582 F.2d 1022, 1026 (5th Cir. 1978) (Citations omitted). As our discussion below makes clear, the evidence was sufficient to allow the jury to convict Jimenez, especially in light of the fact that the burden of showing affirmative acts of withdrawal is on the defendant. See United States Gypsum, supra, 98 S.Ct. at 2887.

2. At one point during the argument of the motion, Jimenez' trial counsel seemed to concede the ambiguous nature of Jimenez' remarks. Responding to the Government's argument that the "deal with Silva" remarks showed that Jimenez intended to stay in the conspiracy, counsel stated:

Of course, I would submit to the Court it is a mere supposition what the Government—what Mr. De Luna's position is as to what his [Jimenez'] intents were. I would submit that the testimony could just as easily demonstrate at that point in time he got out and that there was no further connection there—

Trial Transcript at 118.

Transcript at 31. In addition, Meliton Ramirez, another witness for Jimenez, testified that Jimenez had told him that Jimenez had refused on January 15, even to discuss the possibility of arranging a deal with Agent Henderson and Barbosa-Silva. In view of the nature of the testimony offered by Barbosa-Silva and the internal contradictions of Jimenez' defense, the jury could have concluded that Jimenez remained in the conspiracy, at least in the role of financier, until its completion. There was thus no error in denying Jimenez' motions for acquittal.

## C. *Instructions on Withdrawal from a Conspiracy*

■ Jimenez next contends that the district court improperly charged the jury as to the definition of the defense of withdrawal from a conspiracy. Since Jimenez failed to object to these instructions at trial, we cannot reverse unless there were "plain errors or defects affecting substantial rights" of the defendant. Fed.R.Crim.P. 52(b).

■ The district court instructed the jury on the issue of withdrawal in the following terms:

> Now, the burden of establishing an abandonment of or a withdrawal from a conspiracy lies upon the defendant. It is clear that, once an individual has joined in an unlawful scheme, which is meant to continue until full fruition, in order to be found to have withdrawn from such conspiracy, that individual must show that he acted affirmatively to defeat or disavow the purpose of the conspiracy; in this case, deliberately distributing the cocaine.
>
> An example of such an affirmative action is demonstrated when the defendant makes a clean breast to the authorities or notifies the other members of the conspiracy of a termination of his participation.
>
> Additionally, a defendant is not punishable as a member of the conspiracy if he withdraws before an overt act has been accomplished in furtherance of the agreement's object.
>
> .    .    .    .    .

In the present case, the Government claimed that this man did join a conspiracy. *The Government also claimed that the defendant told Agent Henderson that he wanted out of the deal, but that Agent Henderson could deal with Silva. In other words, he didn't disavow everything. "I want out. You keep on dealing with Silva." That's what the Government claimed.*

> So, under these circumstances, if you, the jury, believe that the defendant's actions amounted to an affirmative act of defeating or disavowing the conspiracy and that such act occurred before an overt act was committed in the furtherance of a conspiracy, then he is not guilty of the crime that he is charged with.
>
> However, if you, the jury, believe that an overt act had been committed or that the defendant has not met his burden of showing or demonstrating a withdrawal, as I have defined that term to you, you may reject his defense of abandonment or withdrawal. Whether or not this man withdrew under the instructions that I have given you from this conspiracy is for you to decide. It is a fact question for you to decide.

Trial Transcript at 304-305 (emphasis added).

Jimenez contends that the standards set forth in these instructions were stricter than those mandated by *United States Gypsum, supra.* There, it will be recalled, the Court stated that withdrawal could be established by "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators    .    .    .." 98 S.Ct. at 2887. Although the trial court in that case had initially stated that the defendants were required to show that they took "affirmative action to disavow or defeat" the purposes of the conspiracy, it went on to limit the jury's consideration of the withdrawal defense "to two circumscribed and arguably impractical methods" of withdrawal, which did not encompass the

theory presented by defendants. *Id. See* p. 755 *supra.* For this reason, the Court found the instructions improper.

In our case, the district court instructed the jury on Jimenez' theory of withdrawal. He told the jury that Jimenez must show that he "acted affirmatively to defeat or disavow the purpose of the conspiracy," and a fair reading of his instructions, particularly that part which we have italicized, shows that the jury was told that it must determine whether Jimenez' statements to Agent Henderson constituted a disavowal of the conspiracy. Since the only act inconsistent with the conspiracy's purposes claimed by Jimenez was his disavowal of it, we cannot hold that these instructions constituted "plain error." There was no reversible error here.

### III.

For the reasons given above, we find no reversible error in the district court's handling of Jimenez' claim of withdrawal from the conspiracy. We have also examined Jimenez' claim that the prosecutor's closing argument was improper and find it without merit. We therefore affirm the judgment of the district court.

AFFIRMED.