UNITED STATES of America,
Plaintiff-Appellee,

v.

Claudy Ray HERRON and Johannes
Faul, Defendants-Appellants.

No. 86–1413.

United States Court of Appeals,
Fifth Circuit.

May 4, 1987.

Bruce Anton, Frank Jackson, Dallas, Tex., for Herron, Faul.

Terry K. Ray, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GARZA, WILLIAMS and GARWOOD, Circuit Judges.

GARZA, Circuit Judge:

Johannes Faul and Claudy Ray Herron, defendants-appellants, challenge the sufficiency of the evidence to support their wire fraud convictions for fabricating and participating in a scheme designed to facilitate a large cash deposit in an American bank without triggering a Currency Transaction Report (CTR). We also consider an issue raised *sua sponte:* whether the facts alleged in the indictment constitute a cogni-

zable violation of the wire fraud statute, 18 U.S.C. § 1343. We find that the indictment did set forth a cognizable wire fraud offense and the convictions entered below were supported by sufficient evidence.

## BACKGROUND

Internal Revenue Service (IRS) informant Nathan Shay first approached a banker, David J. Fisher, in August of 1985 to inquire about depositing large sums of cash in Fisher's bank. Shay claimed he and a partner had invested in a high technology bean-sprout farm which was generating a substantial amount of cash. Shay told Fisher that he had just "endured" an audit by the IRS and now wanted to deposit the proceeds from the farming venture in a manner that would prevent the bank from filing a CTR with the U.S. Treasury Department.[1] Fisher consulted with other bank officers and then declined to become involved. Fisher did inform Johannes Faul, known to Fisher as a financial consultant, about Shay's desire to make large deposits and avoid detection by the Treasury Department. Faul met with Shay and his partner "Thomas Kent"[2] and proposed a number of plans wherein Faul would obtain a percentage of the total cash involved by arranging to have the currency deposited in a bank without a CTR being filed. This was what Shay and Kent wanted because, they said, they had not paid taxes on the approximately one million dollars they wanted to deposit in a bank account without "raising any red flags" to the IRS.

Faul first attempted to exchange $100,-000 in cash for a cashier's check that could be deposited in Fisher's bank without a CTR being filed, but this arrangement fell through. Faul also suggested that Shay and Kent set up an offshore bank to "wash the money clean" without middlemen, but this plan was deemed unattractive. Faul then told Claudy Ray Herron about Shay's situation during a conversation held in late August, 1985. Later, on October 21, 1985, Herron placed a phone call from Faul's office in Dallas to Edward Steph in London, England. Steph was a boyhood friend of Herron's and a London financial consultant. Herron told Steph that there were some people in the United States who wanted to move millions of dollars overseas and establish a banking relationship there. Faul then discussed this matter over the telephone with Steph and John-Seager Green, who was Steph's partner and banker. Green indicated that the minimum amount had to be $500,000, not the $100,-000 amount Faul had suggested, and he asked Faul if the funds were legitimate.

On October 23, 1985, Faul met with Kent to discuss the plan to launder the money through England. The money would go to London and then to Switzerland to be deposited in a Swiss bank; this bank would then wire the money back disguised as a loan or issue certified checks to be brought back and deposited in the United States. This plan met with general approval and was given the go-ahead. Herron was to be used to transport the money to London. Faul told Kent that he had previously discussed this with Herron, and Faul later testified that he probably informed Herron that Shay and Kent had paid no taxes on the money.

Steph and Green arrived in Dallas on November 3, 1985, travelling on tickets prepaid by "expense account" money Faul had

---

1. A financial institution must file a CTR on "each deposit, withdrawal, exchange of currency ... or transaction in currency of more than $10,000." 31 C.F.R. § 103.22(a)(1); *see* 31 U.S.C.A. § 5313(a). A transaction in currency is defined as a "transaction involving the physical transfer of currency from one person to another. A transaction which is a transfer of funds by means of bank check, bank draft, wire transfer, or other written order, and which does not include the physical transfer of currency is not a transaction in currency...." 31 C.F.R. § 103.11(1).

In practice, the regulations require that a CTR be filed for every deposit of cash or currency which exceeds $10,000. If the deposit involves a monetary instrument which represents cash or currency, the financial institution that *re-*

*ceives* such a deposit is not required to file a CTR because the financial institution that *issued* the bank draft, certified check, etc. would have a legal duty to file a CTR when the cash or currency was converted into a paper document. The CTR filing leaves the government a "paper trail" in order to follow the unusual movement of large amounts of money. *See California Bankers Assn. v. Shultz,* 416 U.S. 21, 25–41, 94 S.Ct. 1494, 1500–07, 39 L.Ed.2d 812 (1974).

2. IRS agent Thomas Kemp used the alias of "Thomas Kent" when dealing with Faul and the other principals involved in this undercover investigation. Kent secretly recorded all of the discussions he had concerning this proposed laundering scheme.

obtained from Kent. Since Fisher had decided not to open an account for Shay and Kent, Faul introduced Kent to Gary Tipton, another Texas banker, in an effort to provide Kent and Shay with a place to deposit their overseas cashier's checks. Faul advised Kent not to tell Tipton about the laundering plan; instead, Kent should make Tipton think the money had originated from overseas instead of being transferred there from the United States. If Tipton knew that the wire transfer or certified checks were generated from money originally within the United States, he, like Fisher, would have recognized the scheme as one attempting to avoid detection by the IRS. Kent did as instructed by Faul and made ambiguous representations about the origin of the funds he wanted to deposit. Tipton agreed to accept Kent as a client, and Kent deposited $1,000 in Tipton's bank on November 6, 1985, to open up the account into which the overseas checks ultimately would be deposited. On the same day, Faul asked Kent to sign a letter drafted by Faul which set forth an "agreement" between the two. Faul told Kent it was "no big deal"—he indicated that he needed the letter to satisfy Steph and Green, who had voiced concern over the propriety of the proposed transaction.[3]

Plans were now being finalized; the one change was that Green would carry the money instead of Herron. Faul assured Green that the transaction was legal and showed him the letter endorsed by Kent.

At a Dallas motel, Kent gave Green a suitcase containing $500,000 in cash. It is uncontroverted that Faul specifically told Green to be sure to declare the money at the U.S. Customs gate when departing the country. Kent accompanied Green to the airport and watched him check the suitcase in at an airlines counter. Green did not declare the money even though Faul had instructed him to do so. After Kent and Green waited in the passengers' lounge for some time, they went through an adjoining jetway to board the aircraft. At this point a customs agent approached the two men and arrested Green.

On November 21, 1985, Fisher, Faul, Herron, Steph and Green were indicted for various violations of federal law. Through a superseding indictment, charges were brought only against Fisher, Faul and Herron, and dropped as to Steph and Green, both of whom were called to testify as government witnesses. Count 1 charged Fisher, Faul and Herron with conspiring to defraud the government by impeding and defeating Treasury Department efforts to collect CTRs. Count 3 charged Herron and Counts 2–5 charged Faul with wire fraud. Count 6 charged Fisher with a misprision of a felony and Faul with aiding and abetting him.

Following a jury trial, Fisher was acquitted of all charges. Herron was acquitted of the conspiracy charge but was convicted of wire fraud. Faul was found guilty on Counts 1, 3, 4, 5 and 6, but was found not

---

3. The letter signed by IRS agent "Thomas Kent" read:

Messers Nathan Shay and Tom Kent
Post Office Box 23402
Dallas, Texas 75225
Re: Financial consulting.
Gentlemen:

This letter when accepted by you will evidence our agreement of this date with reference to matters herein set out.

You have asked us to advise you and introduce you to persons and firms that would accept large amounts of cash from you outside of the Federal Reserve system and to credit your accounts in Texas with such funds.

You have assured us the funds are in fact lawfully earned by you in your bean sprout business and you have also assured us that you are not involving us in any illegal activities, and that we are not assisting in any activity that may in any way be interpreted by any federal or other law enforcement agency as being unlawful.

You have also assured us that you are in goodstanding with the I.R.S. and that we are

not assisting you in avoiding or evading of taxes in any way.

We have undertaken to assist you in arranging for the cash to be deposited in an account for you in Europe and immediately thereafter to be transferred to an account in the United States which we shall help you establish in order for you to purchase C.D.'s for one year.

We have also asked you to pay us $10,000 in order to meet the expenses of the traveling parties, including yourself, and it's our understanding that the remaining funds would be credited to our fees which will be 1 percent of the amounts placed in banks and you have agreed to pay. If the foregoing sets out your understanding of our agreement please indicate your acceptance in the space below.
Yours very truly,
Trans Mercantile Corporation
Hannes Faul
 /s/ Thomas Kent

However, testimony at trial brought out the fact that Kent and Shay never made these assurances to Faul. The letter was designed to allay the fears of Green and Steph and procure their cooperation in the laundering scheme.

guilty on Count 2. Faul's subsequent motion for a judgment of acquittal was granted as to Count 6 but denied as to the remaining counts. Faul and Herron filed a timely appeal.

## DISCUSSION

We are concerned here with two legal issues, one raised by the appellants and one raised *sua sponte* by this Court: 1) whether the indictment alleges a cognizable violation of the wire fraud statute, 18 U.S.C. § 1343; and, if so, 2) whether there is sufficient evidence to convict Johannes Faul and Claudy Ray Herron of wire fraud.

*The Theory of the Indictment*

The government's theory of wire fraud was that Faul and Herron schemed to defraud the Treasury Department and IRS out of information contained on the CTR forms. Only two previous cases, *United States v. Richter*, 610 F.Supp. 480 (N.D.Ill. 1985), *aff'd sub nom* on other grounds, *United States v. Mangovski*, 785 F.2d 312 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986), and *United States v. Gimbel*, 632 F.Supp. 748 (E.D. Wis.1985), appeal pending, No. 86-1808 (7th Cir.1986), have considered whether a money laundering scheme designed to prevent the filing of CTRs defrauds the government in a manner prosecutable under the wire fraud statute.[4]

 Our analysis begins with the statute. Title 18, U.S.C. § 1343 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five (5) years, or both.

This statute contains two essential elements: (1) a scheme to defraud (2) using, or causing the use of, wire communications in furtherance of the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Bruno*, 809 F.2d 1097, 1104 (5th Cir.1987); *United States v. Gordon*, 780 F.2d 1165, 1171 (5th Cir.1986). Cases construing 18 U.S.C. § 1343 have recognized several types of fraud. One category includes schemes which intend the deprivation of tangible economic interests, i.e., money or property. *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979); *United States v. Becker*, 569 F.2d 951 (5th Cir.1978); *United States v. Lindsey*, 736 F.2d 433, 436 (7th Cir.1984). Another category concerns schemes to deprive an individual or entity of intangible rights or interests, otherwise known as "fiduciary fraud" or "intangible rights fraud." *Bruno, supra,* 809 F.2d at 1104–06 (public officials' fiduciary duty to

---

4. A number of cases have held that structuring a series of "multiple transactions," each of which is less than the $10,000 reporting threshold per bank per day, does not violate the law because an individual is not required to file a CTR. *See, e.g., United States v. Denemark*, 779 F.2d 1559 (11th Cir.1986); *United States v. Anzalone*, 766 F.2d 676 (1st Cir.1985); *United States v. Reinis*, 794 F.2d 506 (9th Cir.1986). However, other cases have held that where a person is making a deposit or withdrawal subject to a CTR filing by a financial institution and attempts to structure the transaction so as to evade the reporting requirement, this scheme constitutes a crime. *See, e.g., United States v. Cure*, 804 F.2d 625 (11th Cir.1986) (violation of 18 U.S.C. § 371, 31 U.S.C. § 5313); *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979) (violation of 31 U.S.C. §§ 1059, 1081); *United States v. Cook*, 745 F.2d 1311 (10th Cir.1984); *United States v. Puerto,*

730 F.2d 627 (11th Cir.1984); *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir. 1983) (violation of 18 U.S.C. § 1001 committed when defendant "caused financial institutions not to report currency transactions that they had a duty to report and would have reported if they had known about" the scheme); *see also United States v. Hajecate*, 683 F.2d 894, 896–97 (5th Cir.1982) (acts which are themselves legal lose their legal character when they become elements of an unlawful scheme). The instant case concerns a laundering scheme where the money is not broken up into increments but taken out of the country *in toto,* only to be reintroduced into the banking system through a means whereby the origin of the funds is not discoverable by the government. The question of whether money laundering is a wire fraud offense has not been raised in other CTR-evasion cases except for *Richter* and *Gimbel.*

citizens); *United States v. Alexander,* 741 F.2d 962, 964 (7th Cir.1984); *U.S. v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Intangible rights fraud requires a fiduciary relationship between the "schemer" and the party or entity defrauded; without a fiduciary obligation, there is no fraud in depriving another of an intangible benefit. *Richter,* 610 F.Supp. at 494. A third category proscribes schemes to defraud which fail to fit any preconceived mold. "The wire fraud statute under which defendants were convicted, 18 U.S.C. § 1343, condemns *all* schemes to defraud in which interstate wires are used to further the scheme." *United States v. Frick,* 588 F.2d 531, 534 (5th Cir.1979) (citations omitted) (emphasis added). *See also United States v. Condolon,* 600 F.2d 7, 8 (5th Cir.1979) ("fradulent scheme need not be designed to obtain money or property, nor need it involve the breach of fiduciary relationships"); *United States v. Louderman,* 576 F.2d 1383, 1387–88 (9th Cir.1978). This view of wire fraud condemns all schemes to defraud which use interstate wire communications.[5]

The two district court cases that have examined alleged wire fraud violations in the context of laundering schemes designed to avoid triggering CTR reports differ on one crucial issue: the category of fraud in which the avoidance of CTR requirements properly falls. *U.S. v. Richter, supra,* held that CTRs were designed to provide the Treasury Department with *information,* which it specifically termed an "intangible" benefit. 610 F.Supp. at 494, n. 22. Thus, to find a violation of the wire fraud statute, the government was required to show that a fiduciary relationship existed between at least one of the schemers and the person or entity defrauded. Since there was no fiduciary obligation on the part of a private individual to provide CTR information to the government, the *Richter* court dismissed the wire fraud indictments. 610 F.Supp. at 495.

However, in *U.S. v. Gimbel, supra,* another district court considered the applicability of the wire fraud statute to schemes designed to avoid the filing of CTRs by financial institutions. *Gimbel* viewed the scheme as one designed to deprive the government of information *and taxes.* "The ultimate aim of a money laundering scheme . . . is to deprive the government of taxes." 632 F.Supp. at 759. The language of the indictment in *Gimbel* explicitly alleged the deprivation of income taxes. Since the collection of taxes is a tangible economic concern of the United States, it was unnecessary to establish a fiduciary relationship between the defendant and the government. The *Gimbel* court refused to dismiss the indictments for wire fraud.

■ We find the reasoning in *Gimbel* more persuasive and more realistic when assessing the impact of the information required on a CTR. The entire purpose of the CTR filing is to leave a "paper trail" so the IRS will be able to ascertain if taxes have been paid on large sums of money which move in interstate commerce, whether legally or illegally.[6] CTRs are necessarily and ultimately related to the collection of tax revenues, and the purposeful evasion of the CTR requirement to avoid taxes is a scheme to defraud.

---

**5.** Though this is not to suggest that the wire fraud statute is limitless. *See United States v. Bruno,* 809 F.2d 1097, 1105 n. 1 (5th Cir.1987). The wire fraud statute should be carefully and strictly construed to avoid expanding its breadth beyond that intended by Congress. *United States v. Kelem,* 416 F.2d 346 (9th Cir.1969) *cert. denied,* 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970). Indeed, that is precisely why this Court is examining the legal basis of the government theory here.

**6.** Congress described the purpose of the Bank Secrecy Act of 1970, which authorized the Secretary of the Treasury to promulgate appropriate regulations to effectuate Congress' intent, as a mandate "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. *See generally,* H.R.Rep. No. 91–975, 91st Cong.2d Sess. 11 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4394–4408; *California Bankers Assn. v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (Bank Secrecy Act enacted in response to Congressional concern about widespread use of foreign financial institutions to evade domestic law).

In the instant case, the word "taxes" does not appear in the indictment. However, the indictment does describe the scheme[7] which forms the basis of the convictions, and the fourth overt act alleged in the indictment states that Faul "discussed how the informant could deposit a large sum of money into a bank without raising any flags for the IRS." We have closely examined the entire record on appeal, and it is clear that the motivating force behind Faul's actions was an intent to introduce large sums of money into the domestic banking system without triggering a financial institution's reporting requirement. Yet Faul and Herron argue that the crime of wire fraud was not committed because Faul told Green to report the money taken out of the country at Customs;[8] they claim this is conclusive proof that Faul and Herron had no scheme to defraud the government. Green's failure to file Customs Form 4790 and report the $500,000, however, is not essential to the government's case of wire fraud. The failure to declare money when crossing our national border is a separate criminal offense. 31 U.S.C. § 5316; 31 C.F.R. § 103.23. *See, e.g., United States v. Hernando Ospina,* 798 F.2d 1570 (11th Cir.1986); *United States v. Palzer,* 745 F.2d 1350 (11th Cir.1984). The scheme to defraud the government here exists independent of whether a Customs Form 4790 was actually filed: Faul and Herron intended to facilitate the deposit of

the $500,000 in a domestic bank without a CTR filing, a surreptitious goal in violation of federal reporting requirements. 31 U.S.C. § 5313; 31 C.F.R. § 103.22. A scheme designed to cause a bank's failure to file a CTR is directly related to the inability of the IRS to collect taxes, which means that it deprives the government of an economic right. That satisfies the "scheme to defraud" element necessary to state a statutory offense.

The fact that the indictment does allege the failure to file a Customs document does not undermine the validity of the wire fraud convictions. "[I]t is not necessary for the government to prove all of the allegations in an indictment count; it need prove only enough allegations to establish violation of the statute on which the count relies." *U.S. v. Bruno,* 809 F.2d 1097, 1104 (5th Cir.1987); *See United States v. Georgalis,* 631 F.2d 1199, 1205 (5th Cir. 1980). The indictment sufficiently set forth the elements of a prosecutable wire fraud offense. "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Gordon,* 780 F.2d 1165, 1169 (5th Cir.1986) (citing *U.S. v. Webb,* 747 F.2d 278, 284 (5th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985)). Faul and Herron were aware that a "reasonably ascertainable standard of conduct was pro-

7. The part of the indictment entitled "SCHEME" read as follows:

It was a part of this conspiracy that defendants devised a scheme to deposit substantial sums of money, ostensibly belonging to the informant and Agent Kent, into a bank in Dallas, Texas in such a way that the bank would not be required to file a Currency Transaction Report (IRS Form 4789) with respect to such deposit.

It was further a part of this conspiracy that defendants devised a scheme to secretly transport $500,000.00 in cash outside the United States for the use of Agent Kent without filing a Report of International Transportation of Currency or Monetary Instruments (Customs Form 4790) with the Customs Service as required by law.

It was further a part of this conspiracy that said sum, minus a service fee, would be deposited into a bank in Zurich, Switzerland.

It was further a part of this conspiracy that the balance of said sum would be disguised as a loan and sent back to Agent Kent.

It was further a part of this conspiracy that the proceeds of the so-called "loan" would be sent to a bank in Dallas, Texas in the form of a check or wire transfer and deposited into an account set up for the benefit and use of Agent Kent.

8. Counsel indicated at oral argument that Green was a government agent. The record does not bear this out. In fact, Green was originally indicted by the government, and he filed a Motion to Dismiss the indictment due to Outrageous Government Conduct. The charges against Green were dropped after he agreed to testify. At most, Green was an after-the-fact informant and a government witness; he was not a government agent who purposefully failed to declare the money at Customs in order to charge Faul and Herron with wire fraud.

scribed and that the statute was sufficient to advise the appellants that their conduct constituted wire fraud." *Louderman, supra,* 576 F.2d at 1388. *See United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975).

The fact that there were no taxes actually owed on the $500,000 here does not undermine this conclusion. "The Wire Fraud Statute does not require that the scheme be successful, or even that the victim be deceived. It need only be shown that there was a scheme and that interstate wires were 'used as a step in the execution of the scheme.'" *United States v. Jackson,* 451 F.2d 281, 283 (5th Cir.1971), *cert. denied,* 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 881 (1972) (quoting *Huff v. United States,* 301 F.2d 760, 765 (5th Cir.), *cert. denied* 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962)). Faul and Herron argue that the cases which construe fraud under 18 U.S.C. § 1343 all involve "actual economic loss, not just 'economic consequence.'" Our cases do not so hold. *United States v. Frick,* 588 F.2d 531, 534 (5th Cir.1979); *United States v. Condolon,* 600 F.2d 7, 8 (5th Cir.1979). In fact, in *United States v. Patterson,* 528 F.2d 1037 (5th Cir.1976), the defendant was charged with defrauding the phone company by selling electronic devices known as "blue boxes" that could evade toll charges for long distance calls when affixed to an individual's phone. Although several demonstration calls in front of a government informant did not actually defraud the phone company of tolls, we held that there was "no necessity for the government to prove actual financial loss" under the wire fraud statute once intent to defraud was shown. *Id.* at 1041. *Accord, United States v. Schnaiderman,* 568 F.2d 1208, 1213 (5th Cir.1978) (government must demonstrate defendant's "knowing and willful intent to pervert the purpose of the Bank Secrecy Act" to state criminal offense). Such an intent on the part of Faul and Herron is evident here.

**9.** 18 U.S.C. §§ 1956, 1957; 31 U.S.C. § 5324.

**10.** Besides the in-court testimony of Agent Kent, Green, Steph, Faul, and Herron, the government

Our conclusion that the laundering plan constitutes a scheme to defraud is also supported by the considered judgment of Congress. The Money Laundering Control Act of 1986,[9] signed October 27, 1986, by the President, makes the structuring of transactions to evade CTR filing by financial institutions a substantive crime enforceable against individuals. This statute will give the United States a specific tool to use in ferreting out those who attempt to launder money. The narrow question presented here, actually made academic by the new law, is whether a wire fraud violation exists when persons conspire and scheme to launder money and use interstate wire communications to achieve that goal. We hold that it does.

*Sufficiency of the Evidence*

▮ More than enough evidence exists to show a scheme to defraud and the use of wire communications to achieve that end. It is axiomatic that in reviewing criminal convictions we must evaluate the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Heffington,* 682 F.2d 1075, 1081 (5th Cir.1982).

Counsel argues that Faul instructed Green to declare the cash at customs. Green did not do so. Because Faul instructed Green to declare the money, counsel maintains that there is no evidence of a scheme to evade customs reporting and so the convictions of wire fraud must be overturned. This argument is spurious. The indictment did not allege Faul's sole basis for criminal culpability was a conspiracy to evade the filing of a customs report. Faul was also charged with conspiring to defraud the government by defeating the Treasury Department's CTR efforts and by using wire communications to do so. The evidence [10] shows that Faul was heavily involved in arranging for the transfer and conversion of hundreds and thousands of dollars in cash so that it ultimately could be deposited in a Texas bank "without raising

had tapes and transcripts of every discussion about this transaction in which Kent participated as an undercover agent.

any [CTR] flags." Faul does not argue that he did not use wire communications to achieve this. Instead he simply focuses on the fact that Green failed to report the cash to customs while at the airport. That fact is legally irrelevant given the language of the indictment. Faul also argues that there was no transfer of cash "between financial institutions" and no actual reporting requirement needed here. This argument is also without merit. It would require the government to wait until conspiracies or wire fraud schemes have come to fruition. There is ample evidence to support Faul's convictions of conspiracy and wire fraud.[11]

Herron raises a similar claim in an attack on his wire fraud conviction. He concedes that he called Steph and Green on the phone so that the cash could be taken overseas, but he says this scheme is illegal only if no customs report declares the money. That is not the law. In fact, once it was shown that Herron joined Faul's scheme, it was not even necessary for the government to show that Herron actually participated in an interstate communication. *United States v. Snyder,* 505 F.2d 595, 600 (5th Cir.1974), *cert. denied* 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975). Finally, Herron's argument that his wire fraud conviction cannot stand because he was acquitted on a conspiracy count is contrary to well-established precedent. *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

The evidence viewed in the light most favorable to the government clearly supports the convictions obtained below.

AFFIRMED.

GARWOOD, Circuit Judge, concurring in part and dissenting in part:

I concur in the result as to the affirmance of the section 371 conspiracy conviction, and dissent as to affirmance of the section 1343 wire fraud convictions.

As to the section 371 offense, the indictment charged a conspiracy including the following:

"It was a part of this conspiracy that defendants devised a scheme to deposit substantial sums of money, ostensibly belonging to the informant and Agent Kent, into a bank in Dallas, Texas in such a way that the bank would not be required to file a Currency Transaction Report (IRS Form 4789) with respect to such a deposit.

"It was further a part of this conspiracy that defendants devised a scheme to secretly transport $500,000.00 in cash outside the United States for the use of Agent Kent without filing a Report of International Transportation of Currency or Monetary Instruments (Customs Form 4790) with the Customs Service as required by law."

The two above-referenced reports—a Currency Transaction Report, Internal Revenue Service Form 4789 ("CTR"), respecting the Dallas bank and a Report of International Transportation of Currency or Monetary Instruments, Customs Form 4790, respecting the $500,000 in cash to be taken out of the United States—are the only official reports with which the section 371 conspiracy count of the indictment concerns itself.

Concerning the section 371 count, Faul, the sole appellant convicted thereunder, complains on appeal only as to the sufficiency of the evidence. Taking or causing to be taken more than $10,000 in cash out of the United States without filing the report—Customs Form 4790—required by 31 C.F.R. § 103.23(a) is a criminal offense and a civil wrong. *See* 31 U.S.C. §§ 5312(a)(3)(A), 5316, 5321, 5322. A conspiracy to do this is a violation of 18 U.S.C. § 371. Faul impliedly so concedes and in this connection claims only that he is exonerated by reason of his last-minute instruction to Green to file the report, an instruction which Green disregarded. But this instruction came after the conspiracy had

---

**11.** Neither Faul nor Herron raise the question of entrapment on appeal. We mention this only because our close examination of the record and the court's proper jury instruction on entrapment show that the issue of entrapment was presented to and rejected by the jury; we find no entrapment as a matter of law.

been entered into and after virtually all the alleged overt acts had taken place. Under this record, the jury was entitled to find either that the instruction was feigned and not intended to be followed or that it represented at most a change of heart after the conspiracy offense had been committed. It is, of course, well settled that the objects of a conspiracy need not be achieved in order for the offense to have been committed. Withdrawal after entering into the agreement and the commission of one or more overt acts pursuant thereto, does not prevent a conspiracy conviction of the withdrawing party. *See United States v. Jimenez,* 622 F.2d 753 (5th Cir.1980); 2 LaFave & Scott, *Substantive Criminal Law* § 6.5 at 110–11 (1986).

Accordingly, Faul's sole ground of appellate complaint as to the section 371 count conviction must be rejected, and his conviction on that count affirmed.[1]

However, I write separately respecting the section 371 conviction to emphasize my view that section 371 is not violated by a "conspiracy" merely to structure monetary transactions in such a way that one or more of the reports provided for in 31 C.F.R. part 103—principally currency transaction reports ("CTRs"), reports of transportation of currency or monetary instruments, reports of foreign financial accounts, and reports of transactions with foreign financial agencies, described in 31 C.F.R. §§ 103.22–103.25—are not *required* to be filed.[2] *See, e.g., United States v. Denemark,* 779 F.2d 1559 (11th Cir.1986); *United States v. Varbel,* 780 F.2d 758 (9th Cir.1986); *United States v. Espriella,* 781 F.2d 1432 (9th Cir.1986). Of course, if, despite the structuring, a report *is* required and is not filed, then there is an offense. Thus, "structured" transactions have failed of their intended purpose *because* the transaction has been held one *requiring* a report. *See, e.g., United States v. Cure,* 804 F.2d 625 (11th Cir.1986) (individual was a "financial institution" required to report under the definition in 31 C.F.R. § 103.-11(e)(3), and multiple branches of the same bank were a single financial institution for purpose of determining whether the report was required). "Liability, however, depends on whether the bank [or financial institution] was required to file a CTR, for, as previously mentioned, a bank customer is not liable merely for structuring his cash transactions so as to create transactions in which the filing of a CTR is not required." *Id.* at 629.[3]

1. We are not required to scan the record for theories of reversal not urged on appeal. *United States v. Johnson,* 718 F.2d 1317, 1325 n. 23 (5th Cir.1983).

2. In so stating, I do not consider the effect of the Money Laundering Control Act of 1986, subtitle H of Title I of the Anti-Drug Abuse Act of 1986, Public Law 99–570, which was signed by the President on October 27, 1986, well after the instant appeals were filed. The principal provisions of this legislation deal with "laundering" the "proceeds of specified unlawful activity" and engaging in monetary transactions in "property ... derived from specified unlawful activity," now codified at 18 U.S.C. §§ 1956, 1957. These provisions are irrelevant to the point under consideration. The 1986 legislation also provides for a new 31 U.S.C. § 5324 which denounces, *inter alia,* "structuring ... any transaction with one or more domestic financial institutions" when done "for the purpose of evading the reporting requirements of section 5313(a) [dealing with required currency transaction reports; *see* 31 C.F.R. § 103.22] with respect to such transactions." This section is applicable only to transactions "completed after the end of the 3–month period beginning on the date of the enactment of this Act." Public Law 99–570, § 1364(a). Regardless of the precise meaning of "evading" as used in new section 5324, that section bespeaks a congressional recognition in 1986 that existing law did not prohibit the structuring of monetary transactions so that CTRs would not be required, even though this was with "the purpose of evading" that requirement. It also bespeaks an intention to apply the new prohibition only after a three-month prospective waiting period.

3. As explained in *Denemark* and *Cure,* our decision in *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979), is fully consistent with this analysis. *Thompson* held that the transaction—a large disbursement made at one time by one person with the same bank through its chairman of the board, though documented in different instruments so as to appear as separate transactions—was one requiring a report. "[T]he government's proof at trial clearly established a violation of the reporting requirements as defined, in that an unreported physical transfer of $45,000 in cash from the Ridglea Bank to Welch occurred on March 9, 1977." *Id.* at 1203. To the same effect, *see e.g., United States v. Heyman,* 794 F.2d 788, 792 (2d Cir.1986).

The majority opinion does not identify what particular transaction or transactions the conspiracy contemplated which would have *required* a CTR, but as to which the conspirators intended that a CTR nevertheless not be filed. Faul contends that the plan was to bring the money back from abroad by means of a bank check which would then be deposited in a Dallas bank. This would not be a "transaction in currency" requiring a CTR. *See* 31 C.F.R. §§ 103.11(c), 103.22. However, such return of the funds from abroad may have required a report, apparently not intended to be filed by the conspirators, under 31 C.F.R. § 103.23. Further, Faul, Herron, or Green may have been financial institutions under the definition in 31 C.F.R. § 103.-11(e)(3) and hence required to file CTRs respecting the $500,000 in cash. *See Cure, supra.* But, as Faul points out, this theory is not alleged in the indictment. Nevertheless, these contentions need not be determined as the evidence is sufficient to show a conspiracy to take the cash out of the United States without filing the required Customs Form 4790, thus resolving adversely to Faul his sole complaint respecting his section 371 conviction.

I turn now to the convictions of Faul and Herron under 18 U.S.C. § 1343. The "scheme" alleged in all of these counts was the very same scheme alleged in the section 371 count. I cannot agree that this is a "scheme or artifice to defraud" within the meaning of section 1343. No tangible or economic advantage to the participants or detriment to the United States (or anyone else) is alleged,[4] nor is there alleged any attempted breach or diversion of fiduciary duty or services. In upholding a prosecution under section 1343 in respect to a scheme involving bribery of governmental officials, we recently remarked that "an interpretation of the statutory term 'defraud' that includes deprivation of the public's right to the honest and faithful services of its officials reaches the outer limits of meaning that can be placed on the word 'defraud.'" *United States v. Bruno*, 809 F.2d 1097, 1105 n. 1 (5th Cir.1987). Now, only a few months later, we have here already transcended those "outer limits."

I have previously written at length on this general subject in my concurring opinion in *United States v. Curry*, 681 F.2d 406, 418 *et seq.* (5th Cir.1982), and no good purpose would be served by simply repeating that analysis.[5] However, I call particular attention to the fact that "defraud," as used in section 371's prohibition of conspiracy "either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose," is broader than "defraud" as used in section 1343's reference to "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Again, this is explicated in *Curry*, 681 F.2d at 422–24. Nor is there any principled way to limit the majority's broad construction of "defraud" under section 1343 to situations where the government is the "victim," for the language of section 1343 permits of no distinction on that basis. Further, under the majority's construction almost any offense constitutes a scheme to defraud, within the meaning of section 1343, if it involves misleading of or concealment from government officials. Thus, those who are on their way to a contemplated robbery, carrying their weapons in musical instrument cases, "defraud" the city when they tell its

---

**4.** Certainly a scheme to defraud the United States of taxes would meet the requirements of section 1343, but that is simply not alleged. There is no allegation respecting taxes or revenues in any of the section 1343 counts. There is no mention whatever of taxes in the "scheme" portion of the section 371 count (*see* note 7 of the majority opinion), and that is the *only* portion of the section 371 count incorporated into the section 1343 counts. Further, the bare mention of taxes in a single one of the thirty-seven overt acts alleged in a subsequent portion of the section 371 count ("Faul ... discussed how the informant could deposit a large sum of money into a bank without raising any flags for the IRS") is plainly insufficient to convert the section 1343 counts into ones charging a conspiracy to defraud the United States of taxes.

**5.** While *Curry* dealt with 18 U.S.C. § 1341, the meaning of defraud there is the same as in section 1343. *See Bruno* at 1104–05.

inquiring police officers that they are simply a band going to play at a private party. Or, the city is "defrauded" by a murderer who convinces a witness intending to report him to the city police not to do so by falsely leading the witness to believe his alibi.[6]

In this respect, I also agree with the conclusions and most of the reasoning in *United States v. Richter*, 610 F.Supp. 480, 493–95 (N.D.Ill.1985), *aff'd on other grounds sub nom United States v. Mangovski*, 785 F.2d 312 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986). The contrary result was reached in *United States v. Gimbel*, 632 F.Supp. 748 (E.D.Wis.1985), *appeal pending*, No. 86–1808 (7th Cir.1986). However, *Gimbel* seems to me to be driven by the consideration that "money laundering is a fairly recent area of law enforcement concern," for which statutes such as section 1343 should serve as a " 'first line of defense' " or a " 'stopgap device to deal on a temporary basis with the new phenomenon, until particular legislation can be developed and passed to deal directly with the evil.' " 632 F.Supp. at 759 (quoting from Chief Justice Burger's dissenting opinion in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974)). That approach, it seems to me, is fundamentally at odds with the long-standing rules that federal crimes are all statutory and that criminal statutes are to be strictly construed, and, ultimately, with the basic principle that ours is "a government of laws, and not of men." *Marbury v. Madison*, 1 Cranch 137, 163, 2 L.Ed. 60, 69 (1803). It is simply not the business of the federal judiciary to create criminal offenses as a need for them may seem to arise from time to time.

Accordingly, I respectfully dissent from the affirmance of the convictions under section 1343.

**6.** Of course, section 1343 is not violated unless there is also the required communication, but here we are concerned with the separate element of "scheme or artifice to defraud." The communication element can be satisfied in a number of ways. Thus, in the last example, one

of the murderer's conversations with the witness may have been by long distance telephone; similarly, in the former example, the scheme to so mislead the police may have been previously agreed on in a long distance call between those planning the robbery.